Argued June 2, affirmed July 26, 1921.

# NOLL v. CARLIN ET UX.

(199 Pac. 596.)

**Husband and Wife—Wife's Father can Give His Daughter a Home Without Liability to Her Husband.**

1. Though the father of a married woman cannot maliciously interfere with the relations between his daughter and her husband without liability to the husband, he can, when the daughter has abandoned the husband either with or without cause, provide her with a home without liability to the husband for alienating her affections.

**Husband and Wife — Evidence Held Insufficient to Show Wife's Father was Liable for Alienation of Her Affections.**

2. Testimony, merely showing that a wife's father approved her separation from her husband and would give her a home, without evidence that he provoked or caused the separation, is insufficient to impose liability on him for alienation of affections.

**Husband and Wife—Wife's Letter Held Competent to Contradict Husband's Testimony She was Happy.**

3. Where plaintiff, in an action for alienation of his wife's affections, had testified that his wife was happy while she was living in another state from that where her parents, the defendants, resided, a letter, written by the wife during that time to her mother, showing that she was not happy, is competent to contradict such testimony.

**Trial—Admitting Letter Proper in Defense as Part of Cross-examination of Plaintiff Held not to Require a Mistrial.**

4. Where the trial court admitted a letter, which concededly would have been competent as part of the defense, in connection with cross-examination of plaintiff, but at the opening of the trial next morning withdrew the letter from consideration of the jury at that time, the admission of the letter was not so erroneous as to require the granting of a mistrial, and especially where plaintiff stipulated to waive his right to cross-examine the defendant to whom the letter was written.

**Husband and Wife—Wife's Letters to Parents Held Admissible to Show Parents Did not Cause Separation.**

5. In an action for alienation of affections brought against the wife's parents, letters written by the wife to her parents, concerning her difficulties with her husband, which showed that the parents

---

1. On the question of liability of parent for causing separation of husband and wife, see notes in 8 **Ann. Cas.** 813; 9 **Ann. Cas.** 960; Ann. Cas. 1917E, 1017; 9 **L. R. A. (N. S.)** 322; 46 **L. R. A. (N. S.)** 467.

were not urging the separation, are admissible on behalf of defendants.

**Husband and Wife—Wide Latitude of Evidence Permitted in Actions for Alienation of Affections.**

6. In an action against a wife's parents for alienation of her affections, a wide latitude is exercised by the courts in admitting evidence for the purpose of showing the relations between the parties and the motives actuating the parents in their conduct.

**Husband and Wife—Letter of Defendant to Plaintiff, Disproving Alienation of Plaintiff's Wife's Affections, Held Admissible.**

7. In an action against a wife's parents for alienating her affections, where plaintiff alleged that the efforts of the parents to induce the separation had persisted throughout the married life, a letter, written by the wife's mother to the plaintiff four months before the separation, apparently seeking a reconciliation, in response to which plaintiff visited defendants, is admissible over the objection that it was a self-serving declaration.

**Husband and Wife—Evidence as to Plaintiff's Loyalty Held Immaterial, Where Defendants Made No Objection Thereto.**

8. In an action against a wife's parents for alienation of her affections, where there was evidence that the wife had objected to her husband's lack of loyalty during the war, but there was no evidence that the defendants encouraged her in such objection, evidence as to plaintiff's registering for service and purchase of Liberty Bonds was immaterial.

From Crook: T. E. J. DUFFY, Judge.

Department 2.

The defendants are husband and wife and the parents of a daughter named Evelyn, who in December, 1915, in Crook County, Oregon, married the plaintiff and they lived together at different places until about July 5, 1919, when she left him and went to the home of her parents. October 15, 1919, the plaintiff commenced this action, alleging that shortly after the marriage the defendants harbored an intense dislike to the plaintiff and wrongfully and maliciously sought to and did poison and prejudice the mind of Evelyn against the plaintiff and alienated her affections and did induce and entice her to leave and desert him; that they advised her not to

live with her husband; that if she did return to him they would not have anything more to do with her; and that she would have to choose between him and the defendants; that by reason of their acts and conduct in separating them, plaintiff has been damaged in the sum of $25,000, and he prays for punitive damages in the further sum of $25,000. The answer admits that Evelyn is their daughter; that she married the plaintiff; and denies the remainder of the complaint, and for a further and separate defense alleges that the defendants have a strong affection for their daughter; that they have always endeavored to promote her domestic happiness and comfort and have advised and counseled her to continue to make her home with the plaintiff; that at all times they have been ready, able and anxious to promote the domestic happiness of the plaintiff and Evelyn; that many times during their married life, without influence or advice, she became dissatisfied in her domestic relations with plaintiff and left him for about a period of one year and only returned upon the insistence and advice of the defendants; that since July, 1919, they have furnished her the care and comfort of a home because she was their daughter and that in doing so they acted in good faith and not through any malice or wrongful intent toward the plaintiff. The reply is a general denial of the new matter in the answer. When plaintiff rested his case, defendants filed separate motions for a nonsuit which was sustained as to Henry W. and overruled as to Mary Carlin, and after trial the jury returned a verdict in her favor, upon which judgment was entered and plaintiff appeals. There are no exceptions to the instructions. All of the assignments of error are founded upon questions of evi-

dence, in refusing to grant plaintiff's motion for a mistrial and in sustaining Henry W. Carlin's motion for a nonsuit.                                     AFFIRMED.

For appellant there was a brief over the name of *Mr. Jay H. Upton,* with an oral argument by *Mr. C. T. Haas.*

For respondent there was an oral argument by *Mr. N. G. Wallace.*

JOHNS, J.—1. Henry W. Carlin is the husband of Mary Carlin and the father of Evelyn, who is plaintiff's wife. In *Schneider* v. *Tapfer,* 92 Or. 520, on page 536 (180 Pac. 107, 112), this court says:

"The defendant was the father of plaintiff's wife, and it is elementary in cases of this kind that there are two distinct elements of the wrong, which plaintiff must prove, before he is entitled to recover. First: that the defendant did actually alienate the affections of the plaintiff's spouse, and, second, that his action was malicious—that is, intended to injure the plaintiff and being calculated to bring about the alienation."

R. C. L., Volume 13, Section 522, says:

"As affected by the motive of the defendant the cases against parents of the spouse whose affections have been alleged to have been alienated are distinguished from those against strangers. At the present time it is generally well recognized that where a daughter of her own free will and without inducement or solicitations on the part of her parents leaves her husband whether for good cause or not, the parents have a legal right to take her in and support her without becoming liable to the husband in damages, if they use no force or persuasion to prevent her from returning to her husband. As has been well said, 'A father's house is always open to his children; and whether they be married or un-

married it is still to them a refuge from evil and a consolation in distress.' Natural affection established and consecrates this asylum, and if a wife has determined to separate from her husband it is natural for her to return to her father's house, and it is as natural for her parents to receive her and afford her shelter and support. It is also now very generally held that in case of unhappiness and disagreements between a married couple, the law recognizes the right of a parent to advise a son or daughter; and where such advice is given in good faith and results in a separation the act does not give the other spouse a right of action, though in a similar case a stranger would be held liable. A parent may not, with hostile, wicked, or malicious intent, break up the marital relations between his daughter and her husband, simply because he is displeased with the marriage, or because it is against his will, or because he wishes the marriage relation to continue no longer, but according to well-considered modern authorities he may advise his daughter in good faith and for her good to leave her husband, if on reasonable grounds, he believes that the further continuance of the marriage relation tends to injure her health, or to destroy her peace of mind, so that she would be justified in leaving her husband. In such case, a parent may persuade his daughter, and use all proper and reasonable arguments, but the motive and the means employed are always to be considered. It may be shown that the parent acted on mistaken premises or on false information, or his advice and interference may have been unfortunate, still if he acted in good faith and for the daughter's good, on reasonable grounds of belief, he is not liable to the husband. And it has been said that the conduct of parents in such cases is to be liberally construed, and worthy motives are to be presumed. This rule has more frequently been applied in the case of advice given to a married daughter, but it is equally applicable in the case of advice given to a son.''

In Cyc., Volume 21, page 1620, it is said:

" * * A parent may of course be guilty of wrongfully alienating the affections of his child, but only where he does so maliciously. * * "

2. Appellant's brief quotes the following testimony:

"Q. Did he [Henry Carlin] say he knew what was going on?

"A. Yes, sir.

"Q. What did he say as to whether or not he approved of it?

"A. He said he approved of it. * *

"Q. Did you ever hear Mr. Carlin state if Evelyn left you he would see that she would have a home of her own?

"A. Yes, sir."

Assuming all that to be true, in the absence of other testimony showing an evil desire and intent to bring about the separation, it would not sustain a verdict against him. The fact that he approved the separation would not be evidence that he provoked it or was the cause of it, and in saying that if the daughter should leave the plaintiff he would provide her a home, was nothing more than his parental duty. There is no evidence that he had anything to do with it or brought about the separation. As the trial court said:

"It has not been shown in this case he has been active in any particular until the last time they went up there, when it appeared that the young man and the young woman were not going to get along and all that could be said, that he would stand by his daughter and see she had a home. Now he had a right to do that."

There was no error in sustaining the motion for a nonsuit as to Henry W. Carlin. The plaintiff testified that his wife was perfectly happy the two years they lived in Montana. On his cross-examination he

was shown a letter dated there on October 17, 1917, and testified that it was in Evelyn's handwriting. After it was identified and for the purpose of contradicting his testimony as to her happiness, the defense in the cross-examination of the plaintiff offered the letter in evidence, to which the plaintiff made the following objection:

"If the court please, we will have no objection to the introduction of that letter after it has been identified by Evelyn Noll, but it is part of their defense solely and clearly, and as such, is not part of their cross-examination. It is written by a witness who is here in court, fully able to testify and identify the letter; the people who received the letter are in court, fully able to identify the fact that they received the letter; and to at this time allow that letter to be introduced, being part of the defense, not being identified by the recipient or by the sender, I think it is subject to the objection that it has not been identified, and not proper cross-examination. I will promise that at the time of the defense we will have no objection to it."

After argument, the objection was overruled and the letter was received in evidence, of which the following is a copy:

"Gregory, Mont., Oct. 17, 1917.

"My Darling Mother, Father & Bros.

"I will answer your dear letter received yesterday.

"I sure was glad to hear from you. I hadn't had a letter for over a week. I sure was glad to hear you are all well.

"I am sure fine and dandy. We had a letter from Noll's they are at Clyde's. It is a wonder Mr. Noll hasn't got into it before this he sure must keep still while he is down there.

"He is always giving Wilson the deuce at the way they run the government he sure is a pro-German. He and I just have it sometimes, I get so tired of the way he talks about our government, I just hate to

101 Or.—14

live with them. If they buy that place down at Clyde's they sure can run it believe me, I won't live with a Noll any longer than I can get away from here.

"Although I have had a little rest since Noll's have been gone, as there is no one here but R. and I, but he is almost as bad. He is just so afraid."

About that time court adjourned. When it again convened, the following took place:

"The Court: Prior to the recess the court made a ruling on a certain exhibit, the ruling at that time that this was admissible on cross-examination. The court will now reverse its ruling on that, and I will say to you, gentlemen of the jury, the letter that was just read to you is not now before the jury, you will erase any impression you got from that letter on the reading of it, and on the introduction of it, because it is now withdrawn from your consideration.

"Mr. Upton: If the court please, we except to the statement of the court just made and to the ruling just made in withdrawing this letter, for the reason that over our objection the letter was allowed to go to the jury, and the harm, if any, has already resulted to the plaintiff, and we now at this time, on the grounds that the damage resulting to the plaintiff cannot be erased, move for a mistrial.

"The Court: I will say specifically to you, gentlemen of the jury, that the letter that was introduced here, you will erase from your minds, you will completely eliminate it from your thoughts at this time. Your motion will be denied."

The letter which was marked defendant's exhibit 1 was withdrawn from the evidence and marked defendant's exhibit 1 for "identification." It was postmarked Glengarry, Montana, October 18th, and plaintiff testified that it was addressed to Mr. and Mrs. Henry Carlin, Roberts, Crook County, Oregon, the residence and postoffice address of the defendant; and that the address and the words "Mrs. R. Noll,

Glengarry, Montana," in the handwriting of Evelyn, were on the upper left-hand corner of the envelope. Although the court gave the above instructions to the jury, appellant contends that the letter was not admissible and that after it was read to the jury, the damage could not be cured by any instructions of the court; that his motion for a mistrial should have been sustained and that the jury should have been discharged. There is no question about the authenticity of the letter. In fact, appellant's counsel says, "I will promise that at the time of the defense we will have no objection to it." The fact remains that Evelyn wrote the letter and that it tends to contradict the testimony of the plaintiff that at all times they lived happily together in Montana.

3. Under all the rules of evidence the letter was competent, the real objection being that it was received in evidence as a part of plaintiff's cross-examination and that it should only be introduced by the defendants as a part of their own case and where plaintiff would have the right to cross-examine. The fact remains that Evelyn did write the letter and that she addressed it to her mother. As to whether the defendants should or should not call Evelyn as a witness for any purpose was a matter in their sole discretion. When plaintiff rested, it appears that the defendant, Mary Carlin, and her daughter Evelyn, who had been in attendance during the trial, were sick and were not able to be in court, and the question was considered as to whether the trial should be postponed or whether the case could be submitted under an agreement between the attorneys. The record shows the following proceedings:

"Mr. Upton: * * Counsel then suggested to us that if we would stipulate that these six letters were in the handwriting of Evelyn Noll and that Mrs. Henry

Carlin, if she were called, would testify that they were written on the dates they are dated and received at that time, and that he would call only Jim and Mary Carlin and Mr. Carlin, the uncle of this girl, and Mrs. Wells, we would waive our right to cross-examine Mrs. Carlin and offer no objection to the introduction of the letters, expressly stipulating that we do not admit that these letters were written on the day dated and received, but simply that Mrs. Carlin would so testify if she were called. * *

"Mr. Wallace: My purpose is to call but four witnesses. That is the number of witnesses I have on my list to call at this time, and I do not purpose calling any more unless something comes up in the trial of the case, based upon which—your Honor, understand me, I cannot limit myself to the number of witnesses I am going to call. I am not going to do it. * *

"Mr. Upton: I will say this then, Mr. Wallace and your Honor, we made this agreement, we waived our right to examine Mrs. Carlin, with the understanding with counsel that those four witnesses were to be called and trusting in his good faith, we will go ahead and take his statement that those are the four he is going to call.

"The Court: All right.

"Mr. Wallace: Now the letters may go in and be marked and identified by the reporter.

" (The letters so offered were received in evidence and marked Defendant's Exhibits 3, 4, 5, 6, 7 and 8.) "

The trial proceeded and the defense called only the four witnesses named and the plaintiff.

4. It will be noted that by the express terms of this stipulation the plaintiff "would waive our right to cross-examine Mrs. Carlin," and "waived our right to examine Mrs. Carlin." She is one of the defendants and the mother of Evelyn, and is one of the persons to whom the above letter was addressed. In view of the court's instructions to the jury and the fact

that the letter was written by Evelyn to her mother together with the stipulation that plaintiff waived the right to examine or cross-examine Mrs. Carlin, there was no error in overruling plaintiff's motion for a mistrial. It may have been unfortunate for the plaintiff that the letter was ever written but there was not any legal error in the ruling of the court.

5. Defendant's exhibit 3, which was offered in evidence under the above stipulation, was a letter of June 6, 1919, from the wife to her parents, in which she says:

" * * I am so darned homesick this morning I can hardly stand it, I ball half of the time, and I am afraid to leave here as Reuben has threatened to kill me. It doesn't make any difference how long I stay here I never will be happy with Reuben or I never will love him or any of his family. * * Vergil and Maud says I should have gone with you, but you insisted that I stay and try and get along as that was the right thing to do. But what good does it do? (None) I don't love Reuben and what is the use to stay here. * * I could just cry all day if it would take me away from here. Now mama I am going to run away from here I will not stay. I will wash for a living before I will live with a man I do not love. * * Now if you folks want me to come home send me a telegram just say come at once, and if you don't want me, I will run some place Nolls won't find me. * * "

In her letter of May 1st, exhibit 4, speaking of Reuben, she says:

" * * He throwed it up to me the other day I didn't have to be operated on * * Jennie is the only one of the Noll bunch that does treat me decent. * * Maude and Vergil are fine. They are sure good to me. I wouldn't stay a week if it wasn't for them. * * "

In her letter of January 23, 1919, exhibit 5, Evelyn says:

" * * Now don't be surprised if I come home with Emery. I never can stand it here, mother. If they sell out, all right, if they don't all wrong because they are going to move out on the ranch if Jennie moves in town which I guess she will and you know what it means if old lady moves out on the ranch, don't you? * * "

In her letter of April 27th, defendant's exhibit 6, after saying that on their return trip from Portland, Reuben got mad at her and drove the auto about thirty miles an hour over a rough road, she writes:

" * * Reuben sure has changed since you left if I have to stay here I wish you would come back down and stay too. * * "

These letters written by the plaintiff's wife to her parents the last six months preceding the separation were admissible under the stipulation and are competent evidence as tending to show the true state of her feelings and that the defendants did not alienate her affections. The defendants made the plaintiff their own witness:

"Q. Mr. Noll, did you receive a letter from Mrs. Carlin just prior to your making the trip over to the Conners place to see your wife?"

His objection to this question was overruled. After testifying that he had such a letter, he was asked to produce it, which he did. The letter was then offered in evidence:

"The Court: Any objections?
Mr. Haas: None, if the Court please, except that it is a self-serving declaration written by Mary Carlin for the purpose of serving her interests in this case, written since part of this action."

The objection was overruled. Although the transcript of the evidence does not show that an exception was taken to this ruling, it appears from the bill of exceptions that it was taken and allowed. The following is the letter:

"March 2, 1919.

"Dear Boy:

"I am writing you a line for I am all broke up over this affair. I don't know what to make of it for Evelyn said she was going to live with you provided your mother dident stay there and here comes a message saying she was coming home now what is the trouble this time. I am not to blame for this. I am writing her also if I had the means I would come down there for you don't know how I feel about it if she is in the wrong she will surely have to suffer for it and I do hope you both see your mistake before it is to late for I know she does care she is just quick temper and a bad one too of course you are there and I am here but I am doing all I can. You may read all I write her. Try and make up and forget there has been a past.

"Lovingly,
"MOTHER."

6. The plaintiff was married December 13, 1915. His wife left him and returned to the home of her parents July 5, 1919. The complaint alleges that soon after their marriage the defendants "sought to poison and prejudice the mind of said Evelyn his wife, against the plaintiff and alienate her affection, and have ever since" by means of threats and promises tried "to induce and entice her to separate herself from the plaintiff and to leave and desert him." It will be noted that this letter was written to the plaintiff on March 2, 1919, and that the defendant, Mary Carlin, was not called as a witness. It is contended that the letter is a self-serving declaration, incompetent and prejudicial. Here again

it will be noted that through the stipulation, the plaintiffs waived the right to examine or cross-examine Mrs. Carlin. The letter has every evidence of sincerity, and there is nothing on its face which tends to show that it was conceived or manufactured for any future purpose. In Cyc., Volume 21, page 1624, it is said:

"Conversations between plaintiff's husband and his father and between his father and plaintiff's mother while plaintiff and her husband were living with defendants is admissible to explain the relations of the parties and their motives for their actions."

R. C. L., Volume 13, Section 526, says:

"In actions for alienating a spouse's affections the motives actuating the different parties become a material subject of proof, and a wide latitude is exercised by the courts in admitting evidence for such purpose, which ordinarily might be subject to the objection against hearsay evidence and self-serving declarations."

James Carlin, the son, and brother of Evelyn testified that he was at his father's ranch in January, 1919, when the plaintiff and his father came over there and that when they were ready to leave "Evelyn came out as far as the fence and stopped. My mother came out to the car and begged for Reuben to stay, and when she went back to the house she was crying." Another brother, Emery Carlin, testified to about the same thing. Concerning a conversation which he heard between Reuben and Eva about that time, another brother, W. D. Carlin, testified:

"A. Well, they were talking in regard to their home matters, home life, and it seemed like Reuben came over there and tried to get her to go back home, and she told him as long as he lived in the house with his parents she would not go back no more.

"Q. Did Reuben say anything about the reason why he came over there?

"A. Well, it seemed to me the way it was, it was in response to a letter he got from Mrs. Carlin. * *

"Q. He had the letter with him at that time?

"A. Yes, sir. * *

"Q. Did he or did he not say at that time that Mrs. Carlin requested him in that letter to come and see Evelyn and see if he could not straighten up their difficulties?

"A. Yes, sir."

This conversation corresponds with the date of the letter from Mrs. Carlin to the plaintiff and it is apparent that he was then discussing his domestic relations with his wife pursuant to the suggestions made in the letter.

7. The actual separation took place in July, 1919; the action was commenced in October, 1919; the letter was written on March 2, 1919, and it is the natural expression of the feelings of a mother in distress over the domestic troubles between her daughter and her husband. The plaintiff had offered testimony tending to show that Mrs. Carlin was willfully seeking to bring about a separation and the letter was evidence of her then mental attitude and of her feelings, and the proof tends to show that the plaintiff received and acted upon the letter. On principle, *Eagon* v. *Eagon,* 60 Kan. 697 (57 Pac. 942), apparently supports plaintiff's contention. That was an action by the wife against her father-in-law for alienating the affections of her husband, in which she offered testimony of the declarations of the father to his son during the period of alienation, to the effect that he did not want his son to live with the plaintiff and would not give him any money if he continued to do so. Defendant denied the statements and sought to prove that during that period of

time he had told his son at different times to bring
his wife to the defendant's home and that he ought
to live with her. The court held that such declara-
tions were inadmissible as self-serving and were not
part of the *res gestae*. It will be noted that there
the alleged conversations sought to be proved were
between the father and son and that they were not
in the presence of the plaintiff. In the instant case
the letter was written by the defendant, Mrs. Carlin,
to the plaintiff and he acted upon the letter. In that
case there is also a vigorous dissenting opinion by
Mr. Justice Smith, in which he holds that such con-
versations were admissible as part of the *res gestae*.
*Price* v. *Price,* 91 Iowa, 693 (60 N. W. 202, 51 Am.
St. Rep. 360, 29 L. R. A. 150), is a similar case in
which the wife was plaintiff and that court held that
conversations between her husband and his father
and between his father and mother when the two
families were living together at the home of the de-
fendants was competent, "as tending to explain the
relation of the parties to the suit, and the motives
which induced them to act." This was followed by
the case of *Bailey* v. *Bailey,* 94 Iowa, 598 (63 N. W.
341), which was an action by the wife against her
father-in-law for alienating the affections of her hus-
band. There the plaintiff had testified that the de-
fendant had "induced the husband to break his
promise to move with her to a place of his own."
Defendant undertook to show that he had offered
"the husband a place on which to live with plaintiff,
and that the husband refused, stating that he would
not live with plaintiff anywhere." The trial court
sustained objections to the testimony on the ground
that it was a self-serving declaration made at a time
when plaintiff was not present. The opinion says:

" * * In this we think he was in error. The fact
that the statements were not made in the presence
of plaintiff was wholly immaterial, for they were not
offered as bearing upon her knowledge of defend-
ant's treatment of his son. The purpose of the
testimony was to show that defendant had, as a mat-
ter of fact, tried to induce his son to do the very
thing plaintiff was insisting upon, and to show the
condition of her husband's mind and the state of his
affections toward her. Such testimony would have a
tendency to negative the idea that defendant was
trying to induce his son to abandon the plaintiff. It
was substantive testimony of verbal acts tending to
show that he was trying to induce his son to live
with plaintiff, and that the son's refusal to do so was
not brought about by his conduct. * * "

The rules of evidence in this class of cases are
somewhat *sui generis*. The complaint alleges in sub-
stance that the defendant's efforts to alienate the
affections of their daughter were continuous from the
date of the marriage in December, 1915, to the
separation on July 5, 1919, and the letter was writ-
ten on March 2, 1919, during the period of the
alleged alienation and while it was in process and
four months before its completion, and it was written
to the plaintiff by the mother of his wife and there is
evidence tending to show that he acted upon the let-
ter. We hold that the letter was competent in this
kind of a case upon the facts shown in the record.
The trial court allowed much latitude to both sides
in the admission of evidence. Among other things
it appears that the plaintiff's parents are German;
that while they were in Montana the plaintiff and his
wife lived with them that their relations were not
pleasant; and that this had much to do with the
separation. Speaking about plaintiff's father in her
letter of October 17th, above quoted, she says: "I get
so tired of the way he talks about our government, I

just hate to live with them." She also says that her husband "is almost as bad." To offset that letter the plaintiff offered evidence that his father was a native of Pennsylvania and that he had always been loyal to the government and that in Montana the plaintiff was the second man who offered to enlist, although he afterwards claimed his exemption both as a married man and as a farmer. Both father and son testified without objection to acts and facts tending to show their loyalty. On cross-examination the plaintiff was asked if he had bought any Liberty Bonds, to which an objection was allowed and he answered, "I did not." The question was also asked of him:

"Q. Did you and your wife ever talk about buying any Liberty Bonds?

"A. We might have talked about it, yes."

Plaintiff duly objected. Defendant's objection was sustained to the testimony of Mr. Paul, the manager of the Pacific States Telegraph Co., as to whom a certain telegram was charged on the books of his company. In this case there was no offer of proof as to what the evidence might show if admitted. The plaintiff was asked:

"Q. How many men registered before you did for enlistment in Montana?

"A. One.

"Q. After war was declared?"

A motion was made and sustained to strike out both answers. The plaintiff's father was asked:

"Q. What were Reuben's efforts in reference to patriotism and pro-Germanism, so called, when the call for enlistment came out in Montana?

"A. What Reuben done?

"Q. Yes, in connection with Evelyn."

An objection was made and sustained to this and again there was no offer of proof. An objection was also made and sustained to the question:

"Q. Reuben, if Evelyn would consent to go back to live with you now at this time, would you willingly take her back as your wife?"

8. The above is the substance of the remaining exceptions. The court had been liberal in the admission of testimony as to all of the actual facts and as to the evidence to which the objections were sustained, no statement was made to the court as to what it might have shown or proved if admitted. The real question at issue was whether the defendants had alienated the affections of their daughter. Although there is strong evidence tending to show that the daughter strenuously objected to living or associating with plaintiff's parents and to their pro-German attitude and conduct, which may have been the primary cause of the domestic troubles with her husband, there is no testimony which would tend to show that either of the defendants was in any way responsible for her conduct or feelings in those matters. In other words, in so far as the record shows, it was the daughter and the daughter only who made such objections to and criticisms of the plaintiff and his parents, if any were made, and there is no evidence that the defendants were in any way responsible for the opinion, feelings or conduct of their daughter about any of such matters. They were personal only to the daughter, the plaintiff and his parents. Hence the offered testimony was not competent or material under the issues. We have carefully read the record and it may be that the plaintiff has been the unfortunate victim of circumstances, but the question here presented is whether the de-

fendants have with malice and design alienated their daughter's affections and in the ruling of the trial court upon that issue there was no prejudicial error. Judgment is affirmed. AFFIRMED.

BURNETT, C. J., concurs in result.

BEAN, J., concurs.

BROWN, J., Dissenting.—I dissent from the statement contained in the prevailing opinion that defendant's exhibit I, being a letter from plaintiff's wife to her relatives, bearing date October 17, 1917, was admissible. The opinion states:

"The fact remains that Evelyn wrote the letter and that it tends to *contradict* the testimony of the plaintiff that at all times they lived happily together in Montana. Under all the rules of evidence the letter was competent * * ."

It is an attempt to *contradict* the testimony of the plaintiff by an unsworn statement contained in the communication from the wife. If this communication is admissible, where does relevancy commence and competency end?

The defendant wrote a letter to the plaintiff bearing date March 2, 1919, which was received in evidence over plaintiff's objection. The purpose of the letter was to repel the charge of malice. The writer believes that this letter was a self-serving declaration and inadmissible, and its admission in evidence was contrary to the well-established rule of broad application that the declarations of a party in his own favor are not admissible in his behalf: Jones on Evidence (2 ed.), § 236, and the many cases cited in footnote.

Also, it is stated in 22 C. J., page 220, that:

"It is a well-established general rule that a statement of a party, whether oral or written, which is of a self-serving nature, is not admissible in evidence in his favor * * ." Also many authorities there cited.

A text-writer has thus stated the rule:

"A party's declarations in his own favor are, as a rule, incompetent. The extrajudicial statement of one to be benefited by the truth of that which he asserts cannot be received in proof of the facts alleged, either for the declarant's benefit or that of his successors in interest. In most cases, such a statement is plainly irrelevant for the purpose. Self-interest is deemed, in this connection, a controlling motive to misrepresent which will render the declarations inadmissible and authorize their rejection.

"Little probative relevancy is gained from the circumstances under which the self-serving declaration may have been made. Nor is it material, in this connection, whether the assertions are oral or in writing * * ": 4 Chamberlayne, Modern Law of Evidence (Relevancy), § 2734.

To similar effect, see 2 Wharton's Criminal Evidence (10 ed.), §§ 690, 691; *State* v. *Anderson,* 10 Or. 448, where this court held that:

"Evidence of a party's previous declarations is admissible as evidence against him, but not in his favor unless as *res gesta,* in criminal, the same as in civil cases.

To like effect see *State* v. *Smith,* 43 Or. 109, 110 (71 Pac. 973); *Worth* v. *Richter,* 63 Or. 114, 116 (126 Pac. 987); *Service Lbr. Co.* v. *Sumpter Val. Ry. Co.,* 67 Or. 63, 80 (135 Pac. 539); *Hillsboro Nat. Bank* v. *Garbarino,* 82 Or. 405, 410 (161 Pac. 703).

The matter referred to in the letter was material under the issues made in this case. The defendant mother was not liable to plaintiff in damages for the act of desertion by his wife, unless the mother was

actuated by malice or ill will toward the plaintiff in advising her daughter. The defendant cannot disclaim ill will by writing a letter to the plaintiff and then upon trial prove absence of malice by that unsworn self-serving declaration, whether written in good faith or otherwise. If so, a good designing letter-writer might make the better case.

For the reason that I deem the precedent dangerous, I record my dissent.