Argued September 13, reversed November 20, petition for
rehearing denied December 28, 1956

# ANDERSON *v.* STURM
303 P. 2d 509

*E. B. Sahlstrom,* Eugene, argued the cause for appellant. On the briefs were Thompson & Sahlstrom, Eugene.

*Walter J. Cosgrave,* Portland, argued the cause for respondent. With him on the brief were Maguire, Shields, Morrison & Bailey, Portland.

Before WARNER, Chief Justice, ROSSMAN, PERRY and McALLISTER, Justices.

PERRY, J.

The plaintiff commenced this tort action against the defendant to recover damages for the alienation of her husband's affections. The defendant is the mother of Vincent Anderson, who was the husband of the plaintiff. Upon the trial of the cause, the jury returned a verdict for the plaintiff, and the defendant appeals.

The defendant assigns as error the failure of the trial court to sustain her motions for a nonsuit and a directed verdict.

■■ When the sufficiency of the evidence is thus challenged, the evidence offered must be viewed in a light most favorable to the plaintiff, and every reasonable inference that can be drawn from facts favorable to the plaintiff will aid the plaintiff in the establishment

of her cause of action. *Hicklin v. Anders,* 201 Or 128, 253 P2d 897, 269 P2d 521. However, a purely speculative inference or conclusion is not substantial evidence. *Lemons et al. v. Holland et al.,* 205 Or 163, 284 P2d 1041, 286 P2d 656.

■■ The gist of a suit of this type is the intentional and malicious enticing of one spouse to leave the other. Where the defendant is a parent, a plaintiff is required to show by substantial evidence that a defendant's acts were committed either wilfully, maliciously, or from improper motives, from which malice in law could be implied, and that the acts were the controlling cause of the separation. *Hughes v. Holman et al.,* 110 Or 415, 223 P 730, 31 ALR 1108.

■ Also, where a parent is charged by a spouse with the alienation of the affections of his child, a presumption arises that any acts done were done in good faith and not to injure the complainant. *Bradford v. Bradford,* 165 Or 297, 107 P2d 106. This, of course, is a disputable presumption, and may be overcome by either direct or circumstantial evidence.

With these rules of law in mind, we will now examine the evidence in the case.

The plaintiff and Vincent Anderson, son of the defendant, were married on July 29, 1939, and resided in Eugene, Oregon, for a period of about 2 years, then moved to California where they lived until about the time Vincent Anderson was to be called into military service, at which time they moved to Ogden, Utah, where the defendant resided. The plaintiff and Vincent rented an apartment in Ogden and both were employed at the army depot there. In December, 1943, Vincent was inducted into military service where he remained until 1946. During his military service he was stationed at San Diego, California, for about two

and one-half years, and the plaintiff and Vincent resided together at that place. They later moved to Coos Bay where two children were born, and from there plaintiff moved to Portland in March, 1951. Vincent commuted back and forth between Portland and Coos Bay until in September, 1951, when the home in Coos Bay was sold. When Vincent came to Portland, he told plaintiff that he was "tired and nervous" and he was "going down to Southern California to see a friend of ours." Later Vincent went to San Francisco to be with his sister, who was hospitalized, and to see his mother, who was visiting her daughter, and at this time the plaintiff states that she and Vincent were discussing whether they would remain in Portland or return to San Diego. In April, 1952, Vincent rented a home in Ogden, Utah, and the parties moved there. While there is a dispute in the evidence, the plaintiff testified that during all this time their domestic life was tranquil and happy.

While these parties were residing in Ogden, Vincent and his mother, the defendant, took a trip. The plaintiff testified:

"He said he had to go to Coos Bay on business and his mother, Mrs. Sturm, went with him."

Vincent and his mother did not return to Ogden together as he returned via Los Angeles, California. On May 21, 1952, Vincent again left home, his departure being described in the testimony by the plaintiff as follows:

"Q Will you tell then what happened?
"A Well, I went downtown - - -
*    *    *    *    *

"A I told her [Mrs. Sturm] that Vincent wanted to see her up at our house. So she got in the car with me and we drove up to our house.

"Q  Did she express any surprise or wonder as to what he wanted her up at the house for?

"A  No.

"Q  Did she seem to show any concern about it at all?

"A  No.

"Q  Did you then take her up to your house?

"A  Yes; I took her up to our house then.

"Q  All right.  And will you just tell the jury what happened next, then, at the house?

"A  Then Vincent says, 'I am leaving,' he says, 'I am nervous and upset and I am leaving.  I don't know where I am going.'

\*  \*  \*  \*  \*

"A  And so he left then, went out the door, and I started for the door to call to him and she says, 'No; let him go; let him go.'

\*  \*  \*  \*  \*

"Q  All right.  And did he go ahead and leave, then?

"A  Then he left, yes.

"Q  Did you see him again within the next few days?

"A  No, I didn't see him but she told me that she saw him, that he was in town and he had—she had asked him to come back to see her, not to run away just then; to be sure he knew what he was doing, to come back and see her.

"Q  And did you remain then in Ogden for a few days after that?

"A  Yes.  Both our girls had the measles and they were in quarantine, I couldn't leave; I couldn't go on the train or—I just had to stay there.

"Q  During the days when you were there did you have any conversation with Mrs. Sturm?

"A  Yes.

"Q What if anything did she say concerning Vincent's, her son's, having left you and returning to you?

"A Well, I was very upset, of course, and crying a lot, and she said, 'If Vincent ever comes back to you again I will never speak to him.'

"Q Did you thereafter leave Ogden?

"A Well, I didn't have any place to stay and I had no money so I had to—I called my brother and asked him what I should do, and he said to come here to Portland.

"Q And did you then come back to Portland?

"A Yes."

On July 2, 1952, Vincent came to Portland, staying with plaintiff and his children at their abode overnight, and leaving on July 3rd. Prior to Vincent's journey to Portland, the defendant had, on June 9, 1952, written to him a letter, the material parts thereof being as follows:

"* * * Well Ann left and I'm shure she will be much happier in beautiful wonderful Portland and it will be best for all. it wasnt so bad Im quite shure she intended to go all the time.

"God knows Vincent Ive tired to do wright and the best for you.

* * * * *

"Now this decision is made and I beg you to stick to business transactions You simply cannot go on between the fire and the deep blue see.

* * * * *

"Ill enclose a letter to Jacque."

The letter inclosed to "Jacque", Vincent's present wife, is as follows:

"Dear Jacque,

"Many thanks for the letter. I'm writing Vincent so will ans yours to.

"Now Jacque Ill advise you to be very carefull untill this divorce is really filed. dont come to Ogden now Maby closer as L. A. is a long way for Vincent to take of when he gets tired of my complaining I'm only his mother and love him very dearly as do all the family and we think it best for him to be home I need him as well as he needs me.

"This affair has been going a long time and will take some time to settle. so keep your job for a while I'm shure Vincent will adjust himself here and find something and be very happy Utah is a beautiful state it rates first in education per popolation so, be careful, wise and right We can never undo things but its also never to late to do right the greatest power in the world you can love many different people in different ways.

"My son is very dear to me I'm his mother my love for him is deep and real did you ever hear of any one divorceing a mother Well he needs a companion to and that girl seems to be you so we will work together and he'll be abel to fofill all the things he must, a wonderful Son, Husband, Father, also Father your son and see he gets a education he's capable of many things. just needs a little encouragement and help.

"I've been feeling pretty bad but better this morning hope Ive done right in all my trying to help

"just take it easy and do things the right way so I can be proud and happy I dont think it will take this affair to long, as the main this will be financual setlements.

"So for now my love"

On July 12, 1952, Vincent wrote a letter to the plaintiff from Ogden, Utah, stating he did not believe a reconciliation possible, and advising plaintiff against postponing obtaining a divorce from him. The letter

also set forth his views of a property settlement, and further stated that, if she preferred, he would commence the suit for divorce, which he felt should be accomplished at once.

In September, 1952, Vincent filed suit for a divorce from the plaintiff. Thereafter, plaintiff filed her cross complaint, and she was granted a decree of divorce from Vincent.

Because this case must be determined upon the basis of the reasonable inferences that may be drawn from plaintiff's evidence, we have, perhaps, detailed the evidence of the plaintiff more fully than is necessary.

The plaintiff's contention is that there may be drawn from this recital a reasonable inference that the defendant's actions were the controlling cause of the separation of the plaintiff and her husband.

The first separation of these parties, within the time alleged in the complaint, occurred in Ogden, Utah, on May 21, 1952. There is no evidence offered of any acts of the defendant prior to that time that could be considered as relating to the cause of the separation. It would be pure speculation to say that the defendant had counseled the defendant to leave the plaintiff. We do not believe that the defendant's statement ''If Vincent ever comes back to you again I will never speak to him,'' can be construed any more forcefully than to say ''I am glad you are now separated and I do not wish for you to renew your marital status.'' At most, it was approval of the son's previous action, and casts no light upon the cause. *Noll v. Carlin et ux.,* 101 Or 203, 208, 199 P 596.

The same may be said of the letters written by the defendant; they, at most, show approval of his actions, but do not by reasonable inference show any active

participation in bringing about the estrangement of the parties.

The plaintiff in her brief draws the conclusion that the defendant selected "Jacque" as the paramour of Vincent, and so engineered the separation of husband and wife. The only direct evidence upon this subject is by Vincent himself to the effect that he had been in love with Jacque for more than five years, and there is no evidence that defendant had any knowledge of her existence until about the time of the separation.

■ We are unable to find any evidence in this record of acts done or statements made by the defendant from which it might reasonably be inferred that the defendant was the controlling cause of the alienation of her son's affections from the plaintiff.

The cause is reversed with instructions to sustain the defendant's motion for a directed verdict.

Reversed.