Argued May 10, reversed August 11, petition for rehearing denied
October 13, additional petition for rehearing denied
October 19, 1965

# SCHMEER *v.* SCHMEER

404 P. 2d 792

*Leo Levenson,* Portland, argued the cause and filed briefs for appellant.

*R. W. Nahstoll,* Portland, argued the cause for respondent. With him on the brief were Krause, Lindsay & Nahstoll, Fredric Merrill and John Toran, Jr., Portland.

Before McAllister, Chief Justice, and Perry, O'Connell, Denecke and Lusk, Justices.

DENECKE, J.

The ex-daughter-in-law, plaintiff, successfully sued her ex-mother-in-law, defendant, for alienation of the affections of plaintiff's ex-husband, Bob, who is defendant's son. Defendant appeals.

A principal ground of appeal is that defendant's motion for a directed verdict should have been granted as there was no evidence that defendant alienated her son's affections from his wife.

Plaintiff and Bob were married in 1949. Plaintiff had been married before and divorced and had a daughter, Linda, five years old. Plaintiff was 27 and Bob was several years younger. Bob was Catholic; plaintiff was not. They were married in California without the knowledge of Bob's parents. About a month after the marriage they moved to Portland, where Bob's parents lived, and Bob worked in an insurance agency. The couple had three children, the first born in 1952 and the last in 1955.

The evidence from which plaintiff contends the jury could find against defendant came almost entirely from the testimony of plaintiff. Defendant either denied plaintiff's accusations or attempted to explain away any imputations of wrongdoing.

According to plaintiff, when she first met her mother-in-law, a few days after the marriage, defendant asked if she was pregnant. Defendant was unhappy about the marriage because plaintiff was older than Bob; defendant was not informed of the wedding; they were not married in the Church; and plaintiff

had been married before. Bob was hospitalized soon after the marriage and at that time defendant told plaintiff that Bob had too much responsibility and Linda (plaintiff's child by her first marriage) should go to a convent.

In 1951 or 1952 plaintiff and her husband decided they needed a larger house. They found a house they liked; however, defendant said, "It is good enough for you and Linda but it isn't good enough for Bob." Defendant picked out a house she liked and that is the house plaintiff and her family moved to and lived in for six years.

Defendant complained to plaintiff one or two more times after their initial meeting that the marriage was wrong because Bob "married out of his religion." The time of these later occasions is unknown. Plaintiff began taking instruction in Catholicism "right after I came to Portland" and was "converted to Catholicism" in 1960. In that year they were remarried in a Catholic ceremony.

Defendant came to plaintiff's house often. She played with the children. According to plaintiff, she was derogatory in her remarks about Linda, saying, "Oh, Linda, you're so skinny" and "Oh, Linda, your hair is so straight." This was said in a "kidding manner." Defendant told plaintiff Linda made Bob nervous. Bob told plaintiff Linda didn't have proper table manners and his mother told him how Linda should behave. Defendant bought Bob's natural children expensive gifts and "very cheap ones for Linda." Bob commented, "That wasn't very nice of Mother." In 1953 or 1954 Bob adopted Linda.

All of the above except possibly the gifts happened prior to 1955 as defendant was not permitted to see

any of the children after 1954. This was at Bob's insistence.

In 1958 when plaintiff and her husband were quarreling Bob said Linda's paternal grandparents had money and should support Linda; he heard his mother say this but when she said it is unknown. At some unknown time Bob objected to plaintiff buying Linda any Christmas present. In 1959 plaintiff and her husband consulted a psychiatrist in an attempt to aid their marriage and Bob agreed with plaintiff that defendant was cruel in her treatment of Linda. At the same consultation Bob agreed that his mother had called his wife a tramp. When such a statement was made is not known. Again, with the possible exceptions of gifts, this must have referred to conduct prior to 1955.

Defendant told plaintiff in her son's presence that plaintiff did not have anything to say about financial affairs because plaintiff's family "was not helping." Apparently, in connection with both finances and other domestic matters, defendant told plaintiff, "Eunice, in every family one person has to give more than the other and in this one it will have to be you."

Plaintiff testified that her husband at first enjoyed her cooking. At sometime, defendant stated that her son had the flu because plaintiff did not cook properly. In later years Bob complained about inexpensive meals and said they should have steak.

When the couple's first child was born in 1952 defendant came over and criticized plaintiff's taking care of the baby. This worried Bob and he said he did not think the baby was going to live so she called the pediatrician who said that the baby was fine and was being cared for properly.

In 1954 Bob went east for six weeks to an insurance school. According to plaintiff, Bob's mother wrote him suggesting he take out a young woman who had just been divorced from Bob's sister's first husband. According to plaintiff, Bob became very angry when he received the letter and called his mother criticizing her. Bob showed this letter to plaintiff when he returned home and as a result plaintiff and her husband agreed that defendant should not thereafter see their children; and she did not. Defendant has never been permitted to see the child born in 1953.

In 1958 Bob left his father's business, started his own business, and hired a secretary who eventually became his wife. Plaintiff thought he was doing very well but found he was not and was borrowing money from his family. The quarreling between plaintiff and her husband apparently started about this time. He started staying out late or not coming home. He was drinking excessively. He was belligerent and would not talk to plaintiff. As plaintiff's counsel stated, as business worsened, plaintiff's husband got worse. He told plaintiff she was too old for him. He would say the things that plaintiff testified defendant had said five or ten years before.

In 1959 plaintiff took an overdose of sleeping pills and had to be sent to the hospital and again in the same year had to be hospitalized for mental disturbances. In 1959 plaintiff's husband beat her. After both the hospitalization and the beating the husband for a short time was very contrite but soon lapsed back to his regular ways. He also beat Linda on another occasion. In August 1962 plaintiff obtained an order restraining her husband from interfering with or molesting her. This was pursuant to a suit for separate

maintenance which eventually became a suit for divorce. Plaintiff obtained a divorce decree in April 1963. The divorce complaint alleged cruel and inhuman treatment by acts of adultery, excessive drinking, beatings of wife and children, squandering his own and parents' money, refusing to consult about financial affairs, refusing to account to plaintiff as to whereabouts, and consorting with other women.

Bob Schmeer was not called as a witness by either party. The jury could have found he lived in Honolulu in the same apartment building as his mother and was married to the woman who had been the secretary in his Portland office.

The plaintiff rarely, if ever, saw or talked to her mother-in-law after 1958. Her husband told her on several occasions that he had seen his mother. On one occasion when her husband said plaintiff was too old for him, plaintiff said, "Oh, you've seen your mother today, haven't you?" and he said, "Yes."

Does this constitute evidence from which a jury could reasonably find for plaintiff? We hold there was not sufficient evidence to enable a jury reasonably to find that any conduct of defendant was a cause of plaintiff's losing the affections of her husband.

■■ As in any other tort, in an action for alienation of affections, plaintiff must prove tortious conduct upon the part of defendant and that it caused injury to plaintiff, i.e., alienated the affections of plaintiff's husband from plaintiff. *Schneider v. Tapfer,* 92 Or 520, 536, 180 P 107 (1919). In alienation of affection actions against parents we have required such proof to be quite positive. *Schneider v. Tapfer,* supra; *Anderson v. Sturm,* 209 Or 190, 303 P2d 509 (1956). Cf. *Roberts v. Cohen,* 104 Or 177, 188, 206 P

295 (1922), in which the spouse told his plaintiff wife, "I could live with you, but my mother won't let me"; this court held there was evidence of causation.

In this case the conduct of defendant chiefly relied upon as causing her son to turn his affections from his wife allegedly occurred from the marriage until 1954. The one act most relied upon was testified to have occurred in 1954; that was defendant's suggestion to her son in New York that he go out with another woman. From 1958, when trouble appeared in the marriage, the amount of contact the son had with his mother is unknown. The only testimony is plaintiff's to the effect that "in several instances * * * he came home and said he had seen her." During this later period the son borrowed over $30,000 from his father but there is no evidence that this involved contact with his mother except that on one or more occasions, the number is unknown, the mother made the loan for her husband.

In *Eitel v. Times, Inc.*, 221 Or 585, 596, 352 P2d 485 (1960), we stated that the test is, were there facts indicating "that it was more probable than not that defendant's conduct was the cause of plaintiff's injury"? Here, we have two other equally probable causes: first, the woman that the son ultimately married went to work for him as secretary about the time plaintiff and her husband commenced having problems,—1958; second, at this same time the son started his own business, which never was successful, and a cause of concern to both plaintiff and her husband.

It is possible that the mother planted seeds of dissatisfaction in the period 1949-1954 which bore evil fruit five years or more later. However, we are of

464

the view that a jury could not reasonably find that it was more probable that the mother's conduct caused the separation and divorce than the other probable causes.

Reversed.

Krause, Lindsay & Nahstoll, R. W. Nahstoll, Fredric R. Merrill and John Toran, Jr., Portland, filed a brief in support of the petition.

No appearance contra.

Before McAllister, Chief Justice, and Perry, Sloan, Goodwin, Denecke, Holman and Lusk, Justices.

DENECKE, J.

Plaintiff's petition for rehearing denied.

We withdraw the last two paragraphs of our opinion dealing with probable causes.

Holman, J., would grant the petition for rehearing.