Argued February 14, affirmed April 11, rehearing denied May 23,
1922.

## ROBERTS v. COHEN.

(206 Pac. 295.)

**Husband and Wife—In Alienation Action "Malice" Held Question
for Jury Though not Expressly Proved.**

1. In an action for alienation of a husband's affections, malice
need not be expressly proved, but it is a question for the jury as
to whether or not the conduct on the part of the defendant was
justifiable or the acts maliciously committed which were calculated
to produce the results, for under Section 2396, Or. L., which de-
fines "malice" as the wish to vex, annoy or injure another person,
established either by proof or presumption of law, the word
"malice" does not necessarily mean that which may proceed from
a hateful or revengeful disposition, but if the conduct is unjusti-
fiable and caused the injury complained of, malice in law will be
implied.

104 Or.—12

Husband and Wife—Divorced Wife may Sue Former Mother-in-law
   for Alienating Husband's Affections by Malicious Acts.

2. A divorced wife may sue her former mother-in-law for
alienation of the affections of her husband by acts maliciously com-
mitted which were calculated to produce the result.

Husband and Wife—Greater Burden on Plaintiff to Prove Malice
   by Parent.

3. In an action against a parent for the alienation of the hus-
band's affections, a greater burden is placed upon the plaintiff to
establish that the acts of the parent were malicious than if such
relationship had not existed.

Pleading—Liberally Construed on Appeal.

4. Under Section 85, Or. L., providing that in the construction
of a pleading for the purpose of determining its effect, all allega-
tions thereof shall be liberally construed with a view of substantial
justice between the parties, where a pleading was not objected to,
every reasonable inference or intendment should be invoked to
support it on appeal.

Husband and Wife—Allegation of Malice in Alienating Affections
   Held Sufficient.

5. In action for the alienation of husband's affections, allega-
tion of malice on the part of the defendant *held* sufficient.

Husband and Wife—Motion for Directed Verdict Properly Denied.

6. In an action for the alienation of the husband's affections,
where the evidence tended to show that defendant's interference
with the marital affairs of the plaintiff and her husband was mali-
cious, and that the defendant did alienate the affections of plain-
tiff's husband, motion for directed verdict was properly overruled.

Trial—Where Prima Facie Case is Made Motion for Nonsuit will
   be Denied.

7. Whenever competent evidence, sufficient to establish a *prima
facie* case is adduced, the court is required to deny a motion for
nonsuit.

From Multnomah: GEORGE W. STAPLETON, Judge.
Department 2.

This action was brought by Ida V. Roberts to re-
cover from Sarah Cohen damages sustained by reason
of her alienation of the affections of plaintiff's hus-
band. Plaintiff is the divorced wife of Isaac S.
Labowitch, and Mrs. Cohen, the defendant, is the

---

2. Divorce as affecting right to maintain action for alienation
of affections, see note in Ann. Cas. 1912D, 619.

mother of Labowitch. Plaintiff alleges in her complaint:

"That on account of the wrongful acts and malicious interference of the defendant, plaintiff has suffered great distress of mind and has been permanently deprived of her husband's consortium, to plaintiff's damage in the sum of $25,000."

By other averments of the complaint, she claims:

"That plaintiff and Isaac S. Labowitch were married on the twenty-fourth day of March, 1914, at Portland, Oregon, and were husband and wife until the ——— day of November, 1919.

"That the defendant herein well knew that plaintiff herein and Isaac S. Labowitch were husband and wife from the twenty-fourth day of March, 1914, until the ——— day of November, 1919.

"That defendant herein did wrongfully and wickedly alienate the affections of Isaac S. Labowitch from plaintiff herein, so that plaintiff herein lost the love, affection, aid, society and consortium of Isaac S. Labowitch.

"That said defendant herein did alienate the affections of said Isaac S. Labowitch from plaintiff herein by influencing said Isaac S. Labowitch to feel that he had made a mistake in marrying plaintiff, and causing said Isaac S. Labowitch to consider that he had done defendant herein grievous wrong by marrying plaintiff.

"That defendant herein did cause said Isaac S. Labowitch to feel wretched and disgusted on account of his marriage with plaintiff, and impressed upon said Isaac S. Labowitch that the said marriage prevented the said Isaac S. Labowitch from living with defendant.

"That defendant herein did require said Isaac S. Labowitch to give his time and attention to defendant herein, and unless said Isaac S. Labowitch did comply with defendant's wishes in this respect, defendant would blame plaintiff herein for the neglect.

"That defendant herein complained to said Isaac S. Labowitch that plaintiff was not working and earning money to buy her clothes and financially aiding her husband.

"That defendant herein interfered with the marital life of plaintiff and said Isaac S. Labowitch by endeavoring to direct the detail marital acts of said Isaac S. Labowitch."

Thereafter Sarah Cohen, the defendant, filed her answer, denying each and every allegation, matter, and thing therein contained, except that she admitted that Isaac S. Labowitch and plaintiff were married as alleged in plaintiff's complaint.

On the trial of the case the jury returned a verdict in favor of the plaintiff, and assessed her damages in the sum of $2,000. From a judgment entered upon the verdict the defendant appeals to this court, assigning error as follows:

In denying defendant's motion for a judgment of nonsuit, for the reason that the evidence introduced by plaintiff was not sufficient to sustain plaintiff's alleged cause of action, in that no malice was shown on the part of defendant, and that plaintiff had failed to show that defendant was, in any way, responsible for the separation of plaintiff and her husband.

In denying defendant's motion for a directed verdict, upon the grounds set forth in defendant's motion for a nonsuit.

In receiving a verdict in favor of the plaintiff.

In entering judgment in favor of plaintiff.

Affirmed.

For appellant there was a brief over the names of *Mr. Paul M. Long* and *Messrs. Christopherson & Matthews,* with an oral argument by *Mr. Q. L. Matthews.*

For respondent there was a brief over the name of *Mr. C. M. Idleman,* with oral arguments by *Mr. G. G. Smith* and *Mr. Oliver M. Hickey.*

BROWN, J.—The questions arising upon appellant's assignments of error relate to the ruling of the trial court in denying the motions for nonsuit and directed verdict. The correctness of the court's decision upon these motions depends upon the evidence, or lack of evidence, adduced upon the trial for the purpose of supporting the material allegations of plaintiff's complaint. The defendant charges that there is an absence of evidence establishing malice.

The testimony shows the marriage of plaintiff and Isaac S. Labowitch; that they lived together as a happily married couple; that he sent her to California for her health; that during his wife's six-months' stay in California Isaac resided with his mother, the defendant; that upon plaintiff's return she was greeted by her husband with a complaint and summons in a suit for divorce, in which suit, upon trial, he was ingloriously defeated.

The plaintiff gave much testimony, some of which was corroborated, tending to show that her married life with her husband was a happy one, and that the only differences between them were occasioned by the defendant, Mrs. Cohen, the mother-in-law of plaintiff. On the other hand, Mrs. Cohen in her own behalf testified to her great interest in the welfare of her son and his wife, and to her warm affection for the latter. In fact, she made an excellent witness in her own cause. Some of the testimony tends to show that the mother-in-law attempted to direct the domestic relations of her son and his wife in all details, and that this was largely the

cause of the separation. However, defendant's version of her conduct in relation to Isaac's domestic affairs is in direct conflict with the testimony adduced on the part of the plaintiff. Hence the question is properly one for the jury. It was for the trial jury, and not for the trial court, nor is it for this court, to determine the facts.

In the disposition of the motions, our only purpose is to determine the following query: Does the record disclose some competent testimony submitted to the jury, tending to prove each material allegation contained in the complaint, including malice?

While we believe that on the mere question of fact, a detailed report of the testimony will serve no beneficial purpose to the parties nor to the public, we will set out a portion thereof, only to show that the verdict of the jury is supported by evidence.

Plaintiff testified in part, that:

"A. When my husband insisted that he would lay down in the afternoon, she [his mother] says: 'You come with me and go to bed with me. You make him so darned nervous.' The next morning I had to burn incense about 5 o'clock for his breathing. 1 heard her say while I was doing so—it had been prescribed by the doctor—'That awful, awful woman, she will kill him yet.' She got it too; she was in the other room.

"Q. She said that to you?

"A. She said it to herself as I was working with my husband. He was ill, that was why we were there. She insisted that husband and wife should not take trips together. It was better to make them alone.

"Q. And she told you that in your husband's presence?

"A. Yes. * * I wanted him to go to the country for his health, but she said that husband and

wife should never travel together, should never take trips together, that it was not her idea, and she told him that he should not do it.

"Q. And when she said that you were bound to kill him, he was troubled with asthma?

"A. Yes. * *

"Q. And it was according to the doctor's prescription that you burned the incense?

"A. Yes. * *

"Q. Did he hear that statement?

"A. I was in the room and she was in the room, and he was where he could have heard it if he had listened.

"Q. Did she at any time make any statement to you about occupying separate beds? If so, state to the jury.

"A. We had come down perfectly happy to think that my husband really wanted me to go with him. So on the road back from the depot he says: 'It is like my mother says, there is nothing wrong with me, if you wouldn't make me so nervous'—which I heard her tell him myself.

" * * A. At the beginning of our married life she said that we should occupy separate rooms, that we should not sleep together.

"Q. How often did you hear her say that during you married life?

"A. Numerous times; she said it repeatedly.

"Did Ike hear those things?

"A. Yes. When we were in the Venable Hotel I told my mother that we could not sleep separately in the hotel; that we were just married, and we would be laughed at. Other times he insisted when we had an apartment not to do so, because his mother thought it was best.

"Q. He would tell you that?

"A. Yes.

"Q. Did the defendant ever make a statement in your presence, and also in the presence of your husband, Ike, to the effect that you should occupy separate rooms and beds?

"A. Yes. * *

"Mr. Schmitt: Go ahead. You remember the question whether Ike ever after that made any suggestions about your living and occupying separate rooms and beds?

"A. He often did when he became under the influence of his mother. He says: 'Yes, as my mother says, we should sleep separate.' And he said: 'We have only one bed and the lounge'—and she says: "You sleep on the lounge and let my Ike in the bed."

"Q. Did the defendant ever speak to you about doing work?

"A. Yes; she said I was entirely too valuable a woman to stay at home and do housework, and that I should hold a position, and if I earned a dollar I should give my husband fifty cents of it; that was the way she did her husband. * *

"Q. State what remarks she made about people not working.

"A. She said they had no drones in their hive; like the bees they kicked them all out.

"Q. Was that statement made at the same time or approximately the same time that the statements about working were made?

"A. No, at different times in the presence of my husband. * *

"Q. Now, when he would come home after being at his mother's how would he act?

"A. Always something we did wrong. At his mother's suggestion I should do different; his mother said that I should do this or I should do that; when I was ill there was nothing wrong with me. His mother said: ' "Our people never go to bed; you couldn't tie us in bed." We are not that kind of people; my mother is right about it.'

"Q. Did * * the defendant ever make any statements to you that you were not sick?

"A. Yes; she made them repeatedly.

"Q. Was Ike also present?

"A. Yes; at times, not always.

"Q. Now, what did she say?

"A. She would say, 'I can't stand that'—I was coughing very bad. It was the time the doctor thought I had tuberculosis—'I don't see how you can stand that [thereupon the witness coughs repeatedly imitating the conduct of Mrs. Cohen]; I should think you would be disgusted with her.'

"Q. Did she cough that way, as you did?

"A. Yes. * * and she said, 'It makes me so darned nervous I can't stand it.' * *

"Q. What did Ike say?

"A. Sometimes he would say: 'Yes; it is only imagination. My mother is right about it.' Other times he would be sorry for me; I knew he was by the way he looked and acted. * *

"Q. Now, he said he would go broke by your purchasing that coat. Did you ever hear the defendant make any statement about what your extravagance would do?

"A. Yes; it would break him, he would go broke. 'That woman will break you' * *

"Q. Did she make those statements that you would break your husband in the presence of Ike?

"A. At times; yes, when she would get angry. * *

"Q. Why did you move?

"A. I could not endure to live there any more. His mother was making a physical wreck of me. She was always dictating to me, and my husband was always going over there, and she was telling my husband that we should do this way and that way. At one time, the time when I made up my mind to leave, I heard a loud voice and she was talking to my husband, and I heard him say, 'You will have to quit fussing with me about my wife or I will take her and leave,' and she says, 'Take your Gentile wife and leave, and I will cut you out of my will.' And I immediately appeared upon the scene and she looked very pale and said, 'My son is fussing with me over you, Ida, and he says he is going to take you and leave.'

"Q. Had you been looking for places to live?

"A. Not until that time. I had made up my mind I could not stand it any more. And when we were

at home I said: 'What is all this about? I have tried so hard to like your mother and to make her like me.' * * I wanted to like her because she was my husband's mother; I wanted to be friends because I think that is the real way to live; I wanted to entertain them at all times and fix nice dinners for them; and I asked why she spoke that way of me, and he said: 'I guess, Ida, it is as my mother says; you can't never be one of us.' And he says: 'When I die, I guess I will have to go to your heaven.' * *

"Q. And what was said at that time about your moving?

"A. I had been looking for apartments, and I came in * * and stopped in there on our road home for a few minutes, and I was telling her that I was looking for apartments, and she showed a look of surprise, and said: 'I don't want you to move from there. You understand me? If you do you will be sorry. I will get mine Ike back.'"

She found an apartment next to the Jewish synagogue and when she informed her husband he at first approved of it, but after talking with the defendant, said:

"Mine Gott, we cannot move there. My mother won't let us. I cannot live next to the Jewish synagogue with a Gentile wife. I will be laughed at."

Plaintiff further testified:

"And I went and talked to her about it, and she said, 'Yes, I don't want my Ike to live in an apartment next to the synagogue with his Gentile wife.' She says, 'They always say, "There he goes with his Gentile wife."'

"Q. And you did not move?

"A. No; he would not move. * *

"Q. Do you remember another incident that occurred about that time when you were talking about moving that the defendant made any statement what would happen if you would move?

"A. She said: 'I don't want you to move away. * * I don't want you to move from there; I want mine

son near me; I can't give him up.' Then he said: 'Well, we are going to move. And I said: 'Yes, we are going to move; I was looking for a place to move.' And she said: 'If you move from there you are going to be sorry; you won't be living together in five years from now. I have stuck to you, Ike Labowitch, and now you stick to me. I gave up my husband for you, and the man I loved for you; now you stick to me.' She said that to both of us. * *

"Q. You enjoyed each other's company?

"A. We surely did; we were together every moment that he had. Of course, his time was greatly taken up, so I would go to the store at night when they were all gone, as they never seemed to want me there, objected, the mother and the rest of the family to my coming in, and when I was there they all became nervous and excited, * * and so I went to the store in the evening and walked home with my husband every evening when I had an opportunity. * *

"Q. Now, you remember an incident when you had a talk with the defendant, Mrs. Cohen, about going to work after you had been married a year; that you should go to work, and where you should go to work?

"A. I said: 'I will work and help my husband in his store at any time.' * * She said: 'Mine Gott; don't let her work in our store; she will steal us blind, and we will go broke if she would work in his store'—in my husband's store.

"Q. Was Ike there when she said those things?

"A. Yes; Ike was there when she said those things sometimes, * * and sometimes he wasn't.

"Q. Now, when she made that statement that you would steal them blind, and break them up, what did Ike say, * * ?

"A. He would say sometimes 'That is right, that is right; turn the woman loose in a dry-goods store, like my mother says, and she will take everything you have got.' "

Upon plaintiff's return from California her hus-band avoided her, but concerning an accidental meet-ing, she testified:

"He ran out, he ran to get away, and I ran after him; * * I wanted to talk to him, and I asked him why he had done this; 'why did you treat me this way after having been away for my health? Why cannot we make this up and live together? What is wrong?' And he says: 'I could live with you, but my mother won't let me.' And he said: 'I won't talk! I won't talk! I won't talk!' And he ran out of there up the street.

"Q. Did you follow him?

"A. Yes; I followed him for a ways, but I could not run as fast as he could."

1, 2. The plaintiff's recital of the last incident is corroborated by witness Mrs. Adcook.

With what intention or motive did the mother of Isaac S. Labowitch act? Was it malicious, or was it inspired by a proper regard for the welfare and happiness of her son? Malice is an ingredient with-out which the case at bar fails. However, it is not necessary that malice should be expressly proved. The jury may infer malice from facts legally proved, and whether the conduct on the part of defendant was malicious or was justifiable was a question to be determined by the jury. It is well established that a divorced wife may maintain an action at law against her former mother-in-law for alienation of the affec-tions of her husband by acts maliciously committed which were calculated to produce that result.

In actions of this character, the word "malice" does not necessarily mean that which must proceed from a mean, hateful or revengeful disposition, but may imply conduct injurious to another, though proceeding from "an ill-regulated mind not suffi-

ciently cautious before it occasions the injury." If
the conduct is unjustifiable and actually caused the
injury complained of, malice in law will be implied.
By our Code the terms "malice" and "maliciously,"
when so employed, import a wish to vex, annoy or
injure another person, established either by proof
or presumption of law: Section 2396, Or. L.

In the case of *Gee* v. *Culver,* 13 Or. 598, 599, 11
Pac. 302, an action for malicious prosecution, this
court approved the following instruction defining
the term "malice":

"It is not necessary that there should have been
any spite or hatred, or bad feeling on the part of
the defendant toward the plaintiff to constitute mal-
ice, but any wrongful act done intentionally, tending
to injure another without just cause or excuse, is mali-
cious."

To like effect, see *Boland* v. *Stanley,* 88 Ark. 562,
(115 S. W. 163, 129 Am. St. Rep. 114); *Westlake* v.
*Westlake,* 34 Ohio St. 621 (32 Am. Rep. 597).

3. In *Hutcheson* v. *Peck,* 5 Johns. (N. Y.) 196, 210,
KENT, C. J., gave expression to the following, which
has frequently been quoted with approval by text-
writers and courts:

"A father's house is always open to his children;
and whether they be married or unmarried, it is still
to them a refuge from evil, and a consolation in dis-
tress.   Natural affection establishes and consecrates
this asylum.   The father is under even a legal obliga-
tion to maintain his children and grandchildren, if he
be competent, and they unable to maintain them-
selves; and according to Lord COKE, it is 'nature's
profession to assist, maintain and console the child.'
I should require, therefore, more proof to sustain the
action against the father, than against a stranger."

The foregoing is applicable to the case at issue.
The relationship between Mrs. Cohen and her son

Isaac placed a greater burden upon plaintiff in prov-
ing that the defendant's acts were malicious than if
such relationship had not existed.    It likewise served
as a foundation on which to build the defense that
there was no wrongful enticement or persuasion that
caused the alienation of Isaac's affections for his
wife: *Holmes* v. *Holmes,* 133 Ind. 386 (32 N. E. 932).
The presumption being that the mother will act for
the best interests of her son, it is necessary that the
complaint allege, and that the proof establish, malice.
A rule of pleading concisely stated in 1 Standard
Encyclopedia of Procedure, 779, is:

"In an action against parents for the alienation
of a husband's or wife's affections, the complaint
must aver that the acts charged against the defend-
ant were maliciously done."

To similar effect is 21 Cyc. 1620.    In support of
that principle are *Gregg* v. *Gregg,* 37 Ind. App. 210
(75 N. E. 674); *Reed* v. *Reed,* 6 Ind. App. 317 (33
N. E. 638, 51 Am. St. Rep. 310); *Multer* v. *Knibbs,*
193 Mass. 556 (79 N. E. 762, 9 Ann. Cas. 958, 9
L. R. A. (N. S.) 322); *Sickler* v. *Mannix,* 68 Neb. 21
(93 N. W. 1018); *Bennett* v. *Smith,* 21 Barb. (N. Y.)
439; *Hutcheson* v. *Peck, supra; Geromini* v. *Brunelle,*
214 Mass. 492 (102 N. E. 67, 46 L. R. A. (N. S.) 465);
*Schneider* v. *Tapfer,* 92 Or. 520 (180 Pac. 107).

The trial court charged the jury fully concerning
the question of malice.    The court's instructions
were eminently fair to the defendant, and are not
questioned on this appeal.    But in this court the de-
fendant for the first time avers that the complaint
fails to allege malice, and plaintiff answers that in
an action for alienation of affections it is necessary
to allege and prove malice only when punitive dam-
ages are sought.    The plaintiff is in error in her

contention as to the rule of pleading in this kind of a case, being an action by a wife for the alienation of her husband's affections by his mother. The gravamen of the cause of action in the instant case is the malice, if any, that inspired the act of Mrs. Cohen when inducing the separation.

In the case of *Kelso* v. *Kelso,* 43 Ind. App. 115 (86 N. E. 1001), the court says:

" 'The reciprocal obligations of parent and child last through life, and the duty of discharging them does not cease by the marriage of the child: *Tucker* v. *Tucker* (1896), 74 Miss. 93 (19 South. 955, 32 L. R. A. 623); *Rice* v. *Rice* (1895), 104 Mich. 371 (62 N. W. 833).'

"And in the case of *Reed* v. *Reed* (1893), 6 Ind. App. 318 (33 N. E. 639, 51 Am. St. Rep. 310), the court, speaking of such cases, says: 'When trouble and disagreements arise between the married pair, the most natural promptings of the child direct it to find solace and advice under the parental roof. All legitimate presumptions in such cases must be that the parent will act only for the best interests of the child. The law recognizes the right of the parent in such cases to advise the son or daughter, and when such advice is given in good faith, and results in a separation, the act does not give the injured party a right of action. In such a case the motives of the parent are presumed good until the contrary is made to appear.' The rules herein laid down are restricted to suits like the present, where it is sought to recover damages from a parent for the alienation of the affections of a child from a wife or husband."

To similar effect see *Noll* v. *Carlin et al.,* 101 Or. 203 (199 Pac. 596); *Schneider* v. *Tapfer,* 92 Or. 520 (180 Pac. 107); *Pugsley* v. *Smyth,* 98 Or. 448, 459 (194 Pac. 686).

The complaint in the case at bar has not been prepared with the care that should be exercised in the drafting of such a document. Nevertheless, it states

facts sufficient to constitute a cause of action, and sets forth acts upon the part of the defendant that, if true, establish malice.

Our Code (Or. L.) provides at Section 85, that:

"In the construction of a pleading for the purpose of determining its effect, its allegations shall be liberally construed, with a view of substantial justice between the parties."

4, 5. No material averment going to the gist of the action has been omitted from the complaint. Hence the pleading comes within the rule that when a complaint reaches this court without having been demurred to or moved against in any way; every reasonable inference or intendment should be invoked to support it: *Dippold* v. *Cathlamet Timber Co.,* 98 Or. 183, 191 (193 Pac. 909), and authorities there cited. We hold the pleading to be sufficient, as it does, in fact, aver malice upon the part of defendant.

6. It was not error for the court to overrule the motion for nonsuit and for a directed verdict. There was some competent evidence tending to establish that the defendant did alienate the affections of her son as charged in the complaint. There was also some competent evidence tending to prove that the defendant's interference with the marital affairs of the plaintiff and her husband was malicious. The weight of that evidence was for the jury.

In considering a motion for a directed verdict, the rule is thus stated in *Collins* v. *United Brokers' Co.,* 99 Or. 556, 559, 560 (194 Pac. 458, 459):

"In considering this motion, every reasonable intendment and every fair and legitimate inference which can arise from the evidence must be made in favor of the plaintiffs. It is elementary law in this state, that in passing upon defendant's motion for a directed verdict all competent evidence in the record

is entitled to consideration by the court in the light most favorable to the plaintiffs.''

7. The same rule applies to nonsuits. Whenever sufficient competent evidence is adduced at the trial to make a *prima facie* showing, the court is required to deny the motion: *Watts* v. *Spokane P. & S. Ry. Co.*, 88 Or. 192, 196 (171 Pac. 901). See list of Oregon cases collected in *Farrin* v. *State Industrial Acc. Com.*, decided April 4, 1922.

This case is affirmed.                    Affirmed.

Bean and McCourt, JJ., concur.

Burnett, C. J., concurs in result.