**Dorothy Dunn, Appellant, v. Zephania Dunn, Appellee.**

### Gen. No. 30,564.

1. HUSBAND AND WIFE—*motive of parent in causing separation of child and spouse as affecting liability to spouse.* A parent is not liable to the spouse of his child for causing their separation if in so doing he acts in good faith and without malice.

2. HUSBAND AND WIFE—*evidence admissible in action against father-in-law of wife for alienation of husband's affections.* In an action for alienation of the affections of plaintiff's husband, against his father, wherein the chief issues were whether the defendant

caused the alienation of the son's affections, and, if so, whether he acted maliciously or from improper motives, evidence was admissible as part of the *res gestae* and with reference to either issue, as to conversations between defendant and his son in plaintiff's absence, as to the contents of an unsigned letter to plaintiff exhibited to defendant and identified by his informant as one from plaintiff's former husband, as to conversations between plaintiff and said informant, reported to defendant, touching said letter and the plaintiff's relations with her former husband, and as to defendant's expressed belief in the revelations made by said letter and his informant.

3. HUSBAND AND WIFE—*evidence admissible in action against father-in-law of wife for alienation of husband's affections.* Where in an action for alienation of the affections of plaintiff's husband by his father an issue was made as to the good faith of the defendant in causing the separation, and there was in evidence testimony of conversations between defendant and one who informed him of admissions by plaintiff to said informant of plaintiff's criminal record in another city prior to her present marriage, it was not error to admit in evidence admissions by plaintiff, drawn from her on cross examination, of her arrest and conviction in such city.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. H. STERLING POMEROY, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1925. Affirmed. Opinion filed May 25, 1926. Rehearing denied June 7, 1926.

CHARLES R. SMITH, for appellant.

CHARLES A. WILLIAMS and HARRY S. DITCHBURNE, for appellee.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This is a suit to recover damages for the alleged alienation of affections of plaintiff's husband, Calvert Dunn, by his father, against whom a verdict of not guilty was returned. From a judgment entered thereon plaintiff appeals, claiming error in the court's rulings on evidence and instructions given and refused.

Appellant married appellee's son Calvert September 4, 1919. They lived together happily from that

Dunn v. Dunn, 241 Ill. App. 11.

time until their separation, August 4, 1920, and as that fact was not controverted plaintiff's cause was not injured by the rejection of conversations between herself and husband tending to corroborate it, even if they were admissible.

Over objection defendant testified that his son Calvert came to him the latter part of July, 1920 (just after defendant's return from a trip of several months), and told him that he had received an anonymous letter regarding his wife and occurrences during the year that made him suspicious, and requested his father to send him east on the business of the corporation, of which his father was president and he was secretary, and in the meantime to have his wife shadowed by detectives. On grounds hereinafter stated, we think the testimony was competent.

The request being complied with, plaintiff observed that she was followed and telephoned her husband, who returned the following day, August 3, 1920, when defendant was called to their apartment for an interview with respect to which plaintiff and defendant's versions differ. He admitted to her employing the detectives, and told her it was done at the instance of her husband. This part of his testimony she did not deny, but did deny his version of the interview to the effect that he told her it was not proper for her to be associating with a former husband (Sam Tilden), and that was the reason Calvert was suspicious of her; that they should "patch this thing up" and leave everybody else, including Tilden, alone, and that he told his son that he could not "go on an anonymous letter," and told her that there had been nothing serious found out regarding her, and offered her his hand, which she refused.

That night, after her husband had retired, she found in his pocket a letter from defendant to Calvert, written while the latter was away on said trip, directing

him as to business matters and telling him to enjoy himself and "in the meantime forget about Chicago and everybody in it." On reading it she woke her husband, and the father was again sent for. He arrived about two o'clock in the morning of August 4, and wanted to know what was the trouble. She testified, and defendant denied, that he then tried to persuade her husband to leave her, and that he said he would double the son's salary if he would, and would disinherit him if he did not. She said her husband refused to do so, but later in the day came back and told her he was leaving, and she has never seen him since.

Defendant testified that he never offered his son any inducement to leave her, and never heard anything detrimental to her until later that day (August 4) when he received a report from one of the detectives of an interview he had had with a Mrs. Mary York, at her residence, 4508 Oakenwald avenue, after which on the same day he, accompanied by the detective and his son, went to her house, where an interview with her took place first out of the presence of the husband, and immediately afterwards was repeated in his presence.

Both defendant and Mrs. York testified over objection to said interviews, and their version of which is practically the same. This evidence tends to explain why the husband, who according to plaintiff's testimony refused to leave her on the father's request the night before, took his leave of her late in the afternoon of that day.

Mrs. York testified that she had known plaintiff for five or six years; that plaintiff lived at her house in April and May, 1919; that after plaintiff's marriage to Calvert Dunn witness received a letter addressed to "Dorothy Tilden" in her care, of which she informed plaintiff and which she read to her over the telephone; that plaintiff came to her house, read the

letter in her presence, and asked her to keep it for her; that there were several letters from the same person addressed to plaintiff, which she came and got, three or four of them after her marriage to Calvert Dunn. Plaintiff told her the letter was from Sam Tilden, and while there called up a certain restaurant on the telephone for "Sam Tilden" and talked with some party about making an appointment. She then testified to the visit of defendant, his son and the detective at her house that afternoon, and of showing and reading said letter to them.

The letter, which was unsigned, and what was said at that interview, were received over objections. The letter, after stating that Tilden wanted plaintiff to help him in his "present trouble," reads as follows:

"Your name and mine are known in fact they know almost everything and if we do not arrange things properly, we will both go to jail.

"I told you I would protect you in your marriage even if I went to jail, but that was before you told me that you had no use for your husband and now that I know he interests you only as far as his money goes don't think I will be fool enough to save you regardless of myself just so you can enjoy his money.

"If you will meet me at once we probably can fix this thing so that nothing will ever be known about it, and we can both go our ways in peace but as long as you exhibit the spirit you do you can be assured I won't protect you as I did in New York for I no longer have or am entitled to the interest I had in you then. In other words if you refuse to help me and I get in bad because of it I won't do anything to keep you from getting into the trouble.

"You can arrange to meet me at once and get this thing arranged if you want to or you can let it go but I insist that you return this letter at once."

The substance of Mrs. York's testimony as to what plaintiff had told her about herself and Tilden is as

follows: That she (plaintiff) stole money from a cafe, and Tilden stole a car, and the two went to Detroit to sell it, then on to New York, where they were caught by detectives; that Tilden put her on the street as a prostitute; that she got caught and was sentenced to a home for 17 days; that she had "rolled" a man in Detroit and stolen a stick pin and $300 from him, and was again caught, but released on making restitution.

Plaintiff, over objection, which we think was properly overruled, admitted that she married Tilden in May, 1917, and divorced him in September, 1918. In rebuttal she denied receiving the letter and telling Mrs. York what the latter testified to about her past. After making these denials she admitted, over objection, on cross examination that it was true that she was arrested and convicted in New York.

Defendant was asked: "When you heard what Mrs. York had to say and saw this letter did you believe these statements to be true?" Over objection he answered: "I did," and that after the interview with Mrs. York and the reading of said letter his son said: "I am finished. That is conclusive proof. I am going to  *  *  *  leave today"; that later in the day the son came to him and asked to be sent to Canada, saying he was ashamed and disgusted and couldn't show his face among his friends. For reasons stated later we think the objections were properly overruled.

Defendant said that he never had any malice toward plaintiff and never advised his son to leave her.

The main facts in issue were whether the alienation of affections was caused by defendant, and, if so, whether he acted maliciously or from improper motives. Upon these points it is claimed the court received irrelevant and immaterial evidence. The evidence objected to consisted mainly of (1) the so-called Tilden letter; (2) the conversations with plaintiff as testified to by Mrs. York; (3) conversations between defendant and his son in plaintiff's absence; (4) de-

fendant's expressed belief in what he had heard from Mrs. York, and (5) other matters of minor importance, which, if inadmissible, do not constitute reversible error.

Whether the evidence thus objected to be viewed with reference to what caused the separation or the animus with which the father acted we are of the opinion that it was relevant. Certainly if defendant did not cause the alienation he was not confined in his defense to a mere denial of the charge, or alleged facts on which it was predicated, but might show that the alienation was the result of other influences. And if her testimony to the effect that he persuaded her husband to leave her be taken as true, it was, nevertheless, competent for him to testify to facts that had a legitimate tendency to disclose his animus. All the authorities agree that a parent will not be liable to the spouse of his child for causing their separation if his acts are done in good faith and without malice, and in such a case the material point of inquiry is the animus with which the parent is actuated. As said in *Multer v. Knibbs,* 193 Mass. 556: "In such an action, the material question is the intent with which the parent acted, rather than the wisdom, or even the justice, of the course which he took." The court then cites the leading case of *Hutcheson v. Peck,* 5 Johns. (N. Y.) 196, and numerous other cases, some of which are discussed in a footnote to the cases reported in 9 L. R. A. (N. S.) 322. In some of those cases the parent gave advice for the separation upon information received by him. In the case of *Bennett v. Smith,* 21 Barb. (N. Y.) 439, it was said the parent would be protected even though the information might subsequently prove to have been unfounded, if he acted in the honest belief as to its truth and from pure motives. And in *Oakman v. Belden,* 94 Me. 280, the court said: "It may turn out that the parent acted upon mistaken premises, or upon false information,

\* \* \* still, we repeat, if he acts in good faith \* \* \* on reasonable grounds of belief, he is not liable."

Such being the law it would be strange and unjust if in explanation of the intent with which the person charged with alienation acts he could not state what was the information upon which he acted, and whether or not he believed it to be true. It is not the truth or falsity of the statements made by the witness York that was at issue or relevant, but whether so far as they influenced the advice or interference of defendant he acted in good faith and upon reasonable grounds of belief in them. Said conversations and letter, therefore, were admissible as bearing upon the material point of inquiry in such a case, namely, the animus with which defendant acted. They were also admissible as tending to show that the separation was caused not merely through persuasion or interference of the father but by information obtained by the son from a third party which reflected upon the character and chastity of his wife.

Appellant's counsel has cited many cases on the subject of hearsay which are entirely inapplicable. "Where the question is whether a party has acted prudently, wisely, or in good faith, the information on which he acted, whether true or false, is original and material evidence, and not hearsay." Jones, Commentaries on Evidence, vol. 2, sec. 350. The author continues: "That where emotions, feelings or *state of mind* of third parties are to be proved, the courts often permit their declarations as original evidence, although such statements have many of the elements of hearsay. This has often been illustrated in actions for the alienation of wife's affections, and in other actions where state of feeling has been relevant." Many cases are there cited in support of the rule.

We think too that said conversations and what was said by the husband and by the son to or in the pres-

ence of each other form a part of the *res gestae.* The main transaction at issue, namely, the alienation of affections and the inducing cause or causes thereof, is not confined to a particular point of time. "In such cases the declarations, whether verbal or consisting of letters, have been received on the ground that they were a *continuous act* which showed the intention of the person whose motives were in question." Jones on Evidence, sec. 347, p. 824. Discussing the wide application of the term, *res gestae,* in 22 Corpus Juris, § 535, which is defined in 1 Wharton on Evidence, sec. 259, as "those circumstances which are the undesignated incidents of a particular litigated act and which are admissible when illustrative of such act" (see also *McMahon v. Chicago City R. Co.,* 239 Ill. 334), it is there said that the *res gestae* rule is that where the making of a statement in controversy, or the doing of an act, assists in constituting the transaction, or in proving *per se* a relevant fact, the declaration or act is competent (citing many Illinois cases among others); that such statements do not depend for their effect on the credit or credibility of the declarant, but derive their probative force from their close connection with the occurrence which they accompany and tend to explain, and are admissible as original evidence. Under the rule as thus stated we can have no doubt that all that was said at the interview with Mrs. York not only constituted a part of the *res gestae,* but it was relevant as tending to show what influenced the action of both defendant and the husband, and under the same rule the declaration of either the husband or the son to the other was also relevant.

The contention that the Tilden letter was inadmissible because its authenticity was not established is a misconception of the purpose for which it was received. It was not introduced as proof of the facts it purported to state, nor as a letter from Tilden except on plaintiff's admission. Neither was the testi-

mony of Mrs. York's narrative of what plaintiff told her introduced as proof of the facts themselves. Whether what plaintiff told her or what the letter contained were facts was immaterial if defendant had an honest belief that they were. The letter and interviews were introduced upon the theory that having come to defendant's knowledge and being factors which influenced his advice and conduct, they were admissible as original evidence on the theories above stated. If a narrative is actually a part of the *res gestae* it is admissible. Jones, *supra,* vol. 2, sec. 346, p. 817.

The testimony of defendant as to his seeking the return of the son to this country after the alienation, was not admissible, but harmless.

The more serious question is the admissibility of plaintiff's admission, drawn out by cross examination, of her arrest and conviction in New York. Her denial that she had ever told Mrs. York of the same had a tendency to raise the question before the jury whether the conversations between Mrs. York and defendant ever took place or were the result of a conspiracy between them. We are disposed to think that the latitude allowed for determining the credibility of a witness justified the question that drew the admission, which had a tendency to show a reasonable probability of such a conversation between her and Mrs. York which she had put in issue by her denial.

It would extend this opinion to unreasonable length to take up and discuss each point separately as to the instructions given and refused. We have considered them and are of the opinion that as a whole the law of the case was fairly presented. One of the given instructions is objectionable as argumentative, and another alludes unnecessarily to the fact that defendant is not under obligations to settle any claim against the plaintiff for support of the husband, or alimony, etc.

We do not think, however, there was reversible error in the giving or refusing of instructions.

Plaintiff does not and cannot well complain that the jury were not justified in finding absence of malice and justification of conduct on the part of defendant. If the evidence complained of was admissible, as we hold, except as to minor and unimportant matters, and the jury's finding was justified therefrom, no valuable purpose would be subserved by reversing the judgment on mere technical errors in the instructions so long as they were sufficient to fairly state the rights of the respective parties, and were not seriously misleading.

*Affirmed.*

GRIDLEY and FITCH, JJ., concur.