# WORTH v. WORTH, ET AL.

(No. 1881; October 1, 1935; 49 Pac. (2d) 649)

442

For the appellants, there was a brief by *John C. Pickett, C. R. Ellery,* and *Bard Ferrall,* all of Cheyenne, and oral argument by *Mr. Pickett* and *Mr. Ellery.*

444

For the respondent, there was a brief and the case was argued orally by *R. R. Rose*, of Casper.

BLUME, Justice.

This is an action for alienation of affection by a daughter-in-law against her parents-in-law. The plaintiff is the wife of Harold Worth, son of G. M. Worth and Kate Worth, defendants herein. Plaintiff sued to recover the sum of $35,000 from the defendants. The case was tried to a jury, who returned a verdict for plaintiff in the sum of $10,000. Judgment was entered for that amount, and the defendants have appealed. A few brief facts, to elucidate the opinion herein, are as follows:

The defendants, parents of Harold, had a ranch south of Wheatland. Plaintiff, then 22 years of age, was married to Harold, then about 24 years of age, on December 3, 1927. He had been married before and divorced. At the time of the marriage he was working at the mines at Sunrise; the plaintiff was teaching. The young folks moved in with the defendants in the spring of 1928. Everything was harmonious for some time, but plaintiff claims that commencing with the summer or fall of 1928, she was subjected to a systematic unfavorable treatment at the hands of the parents; that they attempted to keep Harold on the farm, when she, plaintiff, felt that it would be better

for them to live at some other place. According to her testimony, a bad scene between her and the defendants, particularly Mr. Worth, took place in the summer of 1929. As a result of this and other unfavorable treatment, she went, so she states, to her own folks in Nebraska in the fall of 1929. A few weeks later she joined her husband on a homestead, where they stayed until the severe weather drove them back to the home of the defendants. They were both there until about February, when another scene, this time with Mrs. Worth, drove paintiff, so she testified, out again, never to return. She again went to Nebraska, where she stayed till spring, when she joined her husband on the so-called Salliday place, some 13 miles from the place of defendants. Subsequent facts, and testimony specially considered, will be mentioned later.

1. The defendants asked the court to give the following instruction "C":

"You are instructed that in an alienation suit by the wife against the husband's parents, the law recognizes the right of the parents to advise and counsel their son in respect to his domestic affairs, and that the law presumes that counsel and advice given by a parent to a son is given in good faith and from proper motives and honest impulses, and that the burden is upon the plaintiff to establish to your satisfaction by a preponderance of all the evidence that such counsel and advice was not given in good faith, but was given through malicious motives directed against her, and unless she has established such facts to your reasonable satisfaction, you will find for the defendants."

Another instruction, named "B" was asked. This was like or similar to the asked instruction "C," except that it contained the further statement reading: "You are instructed that there is a wide distinction between an action by a husband or wife against the parents of either, and one against some stranger who invades the domestic circle and separates husband and

wife." It is not necessary to decide whether this additional instruction should have been given. The court refused to give either of the instructions asked, but aside from the usual instruction on the burden of proof, gave its instruction No. 7, reading as follows:

"The Court instructs the jury that the defendants, being the parents of plaintiff's husband, had the right to receive their son into their home, also the right to counsel and advise him regarding his relations to the plaintiff, in good faith, on reasonable grounds and in the honest desire to promote his welfare and happiness, and they are not responsible for doing any of these things unless they acted not in good faith as above defined, but wrongfully and maliciously; but the law does not justify or excuse parents in willfully and maliciously interfering in the domestic affairs of their married children."

Defendants claim that the refusal to give instruction "C" asked by them is error. The only cases directly in point herein are Cramer v. Cramer, 106 Wash. 681, 180 Pac. 915, and Cornelius v. Cornelius, 233 Mo. 1, 135 S. W. 65, both of which strongly support the claim of the defendants, and Kennell v. Rider, 225 App. Div. 391, 233 N. Y. S. 252. The New York case is brief on this point. It merely says of the requested instruction: "This was a legal abstraction; the contrary had been shown." The case was seemingly of the extreme type, and malice had apparently been shown by evidence which was clear and unequivocal. In the Washington case, the court said:

"In writing appellants requested an instruction to the effect that parents have the right in a moderate, intelligent, and careful manner to advise a son as to his domestic affairs, even as to his living with his wife, and that, if given in good faith and from worthy motives, the wife may not complain even though the advice *contribute in some degree to the result of causing a separation.* Continuing, the requested instruction called attention to the distinction between the case of

a stranger to the blood and that of parents to the effect that in the latter conduct and advice are presumed to be good, and a clear case of want of justification must be shown before parents can be held responsible. The court gave the first part of the requested instruction, but refused the latter portion. * * * * We think the refusal of the requested instruction was reversible error. Although disputed, there was substantial evidence to show appellants had in various ways attempted to counsel and advise their son against respondent's relations with him, including threats to him of disinheritance and frequent efforts to keep him at their home and away from respondent.

"It is not enough to advise the jury simply that their belief in the good faith of the parents is sufficient to warrant a verdict in their favor. When requested, the jury should be directed how to proceed in determining their good faith or lack of it. If there is a presumption in favor of good faith carrying its companion of a burden imposed upon him who assails it, and there is, it is important the jury should be so instructed. The appellants had a right to a direct and positive instruction upon this matter. The reason of the rule of good faith spoken of exacts the presumption which exists."

Counsel for plaintiff claims that instruction No. 7 given by the court subserved all the purposes of the case. That instruction told the jury that parents have certain rights. That, however, clearly falls short of the thought that the conduct and statements of the defendants must be presumed to have been in good faith until the contrary has been shown. Cramer v. Cramer, supra. Counsel further claims that the instruction asked is incorrect in not expressing the fact that the presumption exists only until the contrary is shown. It does not so state directly; but it does indirectly, and sufficiently shows, we think, that the presumption is not a conclusive one, but is rebuttable, and while it might have been more specific, it cannot be held to be so defective that it should be wholly rejected on that account. Wallace v. Ins. Co., 135 Kans. 133,

9 P. (2d) 621; First Nat. Bank v. Assurance Co., 33 Or. 43, 52 Pac. 1050.

It is further contended by plaintiff that it was not proper to give an instruction on presumption; that it disappeared upon the introduction of evidence, and that this showed malice. Originally presumptions of all kinds were but inferences, based on human experience, but some of them, by reason of constantly treating them as rules of law, have from time to time been raised to the position of presumptions of law, or as sometimes called, mandatory presumptions. Watkins v. Ins. Co., 315 Pa. 497, 173 Atl. 644; Ward v. Life Ins. Co., (Conn.) 33 Atl. 902, 904; 5 N. Car. Law Review 297. We take it that we are here dealing with the latter. Questions relating to presumptions have given rise to considerable discussion since the memorable work of Thayer (Preliminary Treatise on Evidence, 1898). While formerly it was thought by many that they are evidence, the authorities now generally are to the contrary. Doubting Thomases, however, still remain. Cases cited in 8 Columbia Law Review 128; Smellie v. Southern Pac. Co., 205 Cal. 820, 287 Pac. 343. A recent note on the subject may be found in 95 A. L. R. 878. We have had occasion to consider the general subject in Hildebrand v. R. R., on rehearing, 45 Wyo. 175, 17 P. (2d) 651, where we held that a presumption disappears when, and only when, it is met by evidence adequate to dissipate it.

The question whether or not an instruction on presumptions should be given has been little discussed in its fundamental aspects, although, as stated in 5 N. Car. Law Review, which seems to be borne out by the reported cases, "the practice of apprising the jury of presumptions is followed constantly in many states." Thus it was stated in an early Missouri case to "let the jury be told" of such presumptions. Grover's Adm. v. Duhle, 19 Mo. 360. And the Alabama court stated

in 1885 that there was no objection to give proper instructions thereon or on anything else which is a matter of law. Westbrook v. Fulton, 79 Ala. 510. But the practice above mentioned has been questioned in later years. Instructions on inferences have at times been condemned. 64 C. J. 527. So, too, it has been held, particularly in negligence cases, that when all the detailed evidence is before the jury, an instruction on presumptions is improper. 64 C. J. 604; 45 C. J. 1362, 1363; cases cited in Hildebrand v. R. R., supra. We expressly reserved a decision on that point in the case just mentioned. Among the cases holding that an instruction is improper are a number from Missouri. We find it stated that "the law is well settled in this state that it is reversible error to instruct the jury as to the existence of a presumption where evidence was introduced to rebut it." McCune v. Daniels, (Mo. App.) 251 S. W. 458, 461. This, to say the least, is disconcerting in the face of the decision of Cornelius v. Cornelius, supra, which holds, in language which is unmistakable, and at length, that it is error not to give an instruction on the presumption in favor of parents in a case such as we have here. The decision has never been overruled, nor distinguished. It is apparent, accordingly, that if this opinion is to be of any value in the future as a guide post, either of security or danger, we must give the subject more than a cursory examination, without heeding the clamor for short opinions.

All authorities agree, we think, that a presumption must be dissipated by adequate evidence. And there cannot be much dispute as to the duty of the court either when there is no contrary evidence, or the evidence is such that the presumption must be said to be rebutted as a matter of law. The case at bar does not fall within either of these classes. The only class of cases which interest us here is that lying between the

two extremes—the cases of doubt. And the crux of the question is as to who shall be the arbiter in such case as to the sufficiency of the evidence produced contrary to the presumption. Is it the trial judge, or is it the jury? Chamberlayne, Modern Law of Evidence, Sec. 1085, holds that it is the court, giving as his reason that to leave it to the jury would be a comment on the evidence. The reason cannot be valid. To state a rule of law cannot be such comment. 5 N. Car. Law Review 299. Wigmore on Ev. (2nd Ed.) Sec. 2491 apparently thinks that the question should be decided by the trial judge. He does not, however, specifically discuss the subject of instructions, but mainly the point of shifting of the burden to go forward with the evidence, and we do not know that he had in mind the situation presented in this case. There are authorities which state that the weight and effect of a presumption of law, and the amount and character of the proof necessary to overcome it, are questions for the court. State v. Green, 78 Utah 580, 6 P. (2d) 177, 184; Spaulding v. Ry. Co., 33 Wisc. 582, 592; Menominee River Sash & Door Co. v. R. R. Co., 91 Wisc. 447, 65 N. W. 176; Louisville & N. R. Co. v. Lumber Co., 125 Ala. 237, 28 So. 438. But in all of these cases, except the Green case, which was a criminal case, the evidence was such that the court was required to hold that the presumption had been rebutted as a matter of law. In such a situation the statement above mentioned was, of course, correct. The Spaulding case was quoted with apparent approval in Scarpelli v. Washington W. P. Co., 63 Wash. 18, 114 Pac. 870. The law in that state appears to be, however, that the court is the final arbiter only when it can be said that a presumption has been dissipated as a matter of law. McMullen v. Warren Motor Co., 174 Wash. 454, 25 P. (2d) 99; J. & H. Goodwin Co. v. Schwaegler, 147 Wash. 547, 266 Pac. 177; Feldtman v. Russack, 141

Wash. 287, 251 Pac. 572. That is the rule in other states. Alabama G. R. R. Co. v. Taylor, 129 Ala. 238, 29 So. 673, in connection with New York Life Ins. Co. v. Beason, 229 Ala. 140, 155 So. 531; Atchison T. & S. F. Co. v. Geiser, 68 Kans. 281, 75 Pac. 68, in connection with Wallace v. Ins. Co., 135 Kans. 133, 9 P. (2d) 621. See also cases hereafter cited.

There is nothing in the rule that presumptions are not evidence, but take the place only of evidence, and in the fact that they disappear when evidence to the contrary has been produced, which inherently requires or even suggests that the trial judge is the final arbiter of when sufficient evidence has been brought forward to cause the disappearance. To hold that he is such final arbiter in all cases can, it seems, be arrived at only upon the theory that the jury must be prevented at all hazards from putting a presumption in the scale of evidence, or by ascribing to presumptions (see Jones, Ev. (2nd Ed.) Sec. 41) the limited function in all cases of making a *prima facie* case, and compelling the adverse party, in the face of it, to go forward with the evidence at the peril of losing his suit. Under this view, a *prima facie* case made by a presumption would, of course, be placed in a much inferior position than a *prima facie* case made by testimony, for in the latter situation the court, after contrary testimony has been produced, submits it all to the jury. There seems to be objections to the unconditional acceptance of this limited view. The court, it is true, declares the rules of law applicable in a case. But that consists, in connection with the point before us, of the presumption. Whether it has been met or not is ordinarily a pure question of fact, and the right of the trial judge to be the final arbiter thereof would seem, except, of course, in a clear case, to be anomalous. The right to determine when a rule of law is applicable can hardly be said, it would seem, to include the right to determine

the weight of the facts and the credibility of witnesses. If the judge deems the evidence insufficient, and the presumption is controlling, he will, of course, direct a verdict. If, on the other hand, he should deem the evidence sufficient from the standpoint of weight and the credibility of witnesses, and he should decide not to submit the presumption to the jury, peculiar situations might arise. The jury might disagree with him. It may be argued, of course, that if they do, and they do not deem the witnesses credible and the weight of the facts sufficient, they will find against them, and hence no harm is done. That would, doubtless, be true in many cases. But it would depend on the character of the evidence produced. In many cases it would, probably, not be true. The jury might, though reluctantly, in case they do not have the presumption before them, agree to find in favor of the party producing evidence against it, when they would find against him if they knew of the presumption. And to have it before them would not, it would seem, necessarily, mean that they would consider it to be evidence (Colangelo v. Colangelo, 46 R. I. 138, 125 Atl. 285), although we cannot say that an argument to the contrary is without force. Hence it would seem that if we want to adhere to our system of submitting facts to the arbitrium of a jury, and not make an exception in this case, we should leave the determination of whether or not a presumption has been dissipated to them until it has been dissipated as a matter of law. See Karsen v. R. R. Co., 29 Minn. 12, 11 N. W. 122. Two different rules are conceivable in that connection: (1) To carry out the principle relating to the duties of a jury logically, the fact whether a presumption has been dissipated or not should be left to them, unless the evidence as a whole, and taking into consideration the evidence produced by both parties, is such that it must be declared to be dissipated as a matter of law. This seems to be the view taken

in some of the cases. See Wilson v. Grace, 273 Mass. 146. (2). The fact of dissipation of the presumption should be left to the jury until the evidence of the party against whom the presumption operates—and not considering the evidence of the opponent—can be said to be sufficient and credible to dissipate it as a matter of law. This seems to be the view taken by some of the courts. It is not necessary to decide herein which of these views is correct, since neither the testimony for the plaintiff alone nor all of the testimony, can be said to be such as to dissipate the presumption involved herein as a matter of law. Some of the courts accept neither of these views. They hold, at least in some cases, that if the evidence offered by the party against whom the presumption operates *may be construed as having a tendency* to dissipate the presumption, it will not be submitted to the jury, even though such evidence may be construed to the contrary. This seems to be the view taken, for example, in Cleveland etc. R. R. Co. v. Wise, 186 Ind. 316, 116 N. E. 299; Brannock v. Jaynes, 197 Mo. App. 150; In re Bryant's Estate, (Cal.) 43 P. (2d) 529, 533. It may be that this view is proper as applied to some presumptions, but would seem to go too far as applied to others, and that it has not been accepted as a general rule is shown by many cases.

Some courts have pointed out that while some presumptions are merely convenient procedural rules, others are not. Watkins v. Ins. Co., 315 Pa. 497, 173 Atl. 644; Zabarsky v. Ins. Co., 97 Vt. 377, 123 A. 520. In Pennsylvania the rule is that whether a "presumption is rebutted is for the jury, unless the evidence to the contrary is clear, positive, credible and either uncontradicted, or so indisputable in weight and amount as to justify the court in holding that a verdict against it must be set aside as a matter of law." Patterson v. Ry. Co., 210 Pa. 47; Kreamer v. Perkiomen, 214 Pa.

219; Unger v. R. R. Co., 217 Pa. 106; Kelley v. Director, etc., 274 Pa. 470. This conforms to the rule of Washington, Alabama and Kansas above mentioned. In Hamby v. Crisp, 48 Ga. App. 418, 172 S. E. 842, the court stated that whether a presumption of law "has been successfully rebutted with testimony is ordinarily a question for the jury." In Miller v. Service Sales Inc., (Or.) 38 P. (2d) 995, it was said that "ordinarily a jury determines whether a *prima facie* case based upon a presumption or inference has been overcome." Similar in effect are Kresse v. Life Ins. Co., 111 N. J. L. 474, 168 Atl. 634; Empire Co. v. Glass Co., (CCA) 71 F. (2d) 539, 560; Hoffman v. Ry. Co., 43 Minn. 334, 45 N. W. 608; Karsen v. Ry. Co., 29 Minn. 12, 11 N. W. 122; Greenfield v. R. Co., 83 Ia. 270, 49 N. W. 95; New York Life Ins. Co. v. Beason, supra. In some cases it is held that a "presumption of law cannot be said to be rebutted where the evidence of equally credible witnesses for and against the presumption is equally balanced * * *. Where the evidence for and against the presumption are equal, the presumption will prevail." Rowe v. Rowe, 144 Va. 816, 130 S. E. 771; Graves v. Colwell, 90 Ill. 612; see Hartford Empire Co. v. Glass Co., supra; Monaghan v. Motor Co., (Mont.) 29 P. (2d) 378.

Substantially the same thought seems to be expressed in New York Life Ins. Co. v. Bradshaw, (CCA) 2 F. (2d) 457; New York Life Ins. Co. v. Weaver, (CCA), 8 F. (2d) 680; Von Crome v. Travellers' Ins. Co., (CCA) 11 F. (2d) 350, where the following is stated to be the rule:

"The presumption against suicide or self-destruction is a rebuttable one, and cannot properly prevail, except in the absence of evidence as to the cause of death, or where there is such evidence, and it is conflicting, or some of it is consistent with a reasonable hypothesis of death by accident or by the act of another."

In Chaika v. Vanderberg, 252 N. Y. 101; Moore v. Rosenmond, 238 N. Y. 356; McMullen v. Warren Motor Co., 174 Wash. 454, 25 P. (2d) 99, it is held that a presumption is not overcome by testimony of intertested witnesses.

None of the cases so cited, except three, deals with the question of an instruction to the jury, but it would seem that if they must decide whether or not a presumption has been rebutted, they must have knowledge of it. Thus it was said in Cogdell v. R. Co., 132 N. C. 852, 44 S. E. 618, that a "presumption has a technical force or weight, and the jury, in the absence of sufficient proof to overcome it, should find according to the presumption," which, of course, they could not do, if they know nothing about it. In Marston v. Bigelow, 150 Mass. 45, the court says that the weight of a presumption (or inference) of the receipt of a letter, when mailed, etc., but the receipt of which is denied, is for the jury, and that they should give such weight thereto *as they thought it entitled to.*" Refusal to give an instruction on the same presumption, and under the same circumstances, was held error in J. & H. Goodwin Co. v. Schwaegler, 147 Wash. 547, 266 Pac. 177. In Greenfield v. R. Co., supra, the court held that the question whether a presumption had been rebutted was for the jury, and it also approved of an instruction thereon. In McMullen v. Warren Motor Co., supra, the court held that when a presumption is attempted to be met by testimony of interested witnesses, it is still in the case, and should be called to the attention of the jury. Refusal to give an instruction on a presumption was held error in the following cases: that fraud is not presumed, Price v. Heath, 41 Hun. 585; that a certain presumption arises when an account has been rendered, Johnson v. McCampbell, 11 Heisk (58 Tenn.) 27; that defendant is presumed, in certain cases, to have obeyed the law, Thayer v.

Glynn, 93 Vt. 257, 106 Atl. 834; Clark v. Demars, (Vt.) 146 Atl. 812; that failure to produce testimony creates an unfavorable presumption, Cotton States Fertilizer Co. v. Childs, 179 Ga. 23, 174 S. E. 708. See also New York Life Ins. Co. v. Bradshaw, supra. In a number of other cases, an instruction on presumption has been held proper: Davis v. R. R. Co., 45 Utah 1, 142 Pac. 705; Baltimore & Ohio Ry. Co. v. McKenzie, 81 Va. 71, 77; Kennedy v. Walcott, 118 O. S. 442; Hills v. Goodyear, 4 Lea (72 Tenn.) 233; Northern Pac. Ry. Co. v. Spike, 121 Fed. 44; Shrank v. Ry. Co., 159 Mo. App. 299, 140 S. W. 319; Day v. Ins. Co., 111 Wash. 49, 189 Pac. 95; De Lorme v. Stauss, 127 S. C. 459; 121 S. E. 370; Wallace v. Ins. Co., 135 Kans. 133, 9 P. (2d) 621; First Nat. Bank v. Assurance Co., 33 Or. 43, 52 Pac. 1050; Colangelo v. Colangelo, 46 R. I. 138, 125 Atl. 285; see also 64 C. J. 526, 604, 979; 45 C. J. 1362. See further 27 C. J. 81-82, where a number of cases are cited in which an instruction on the presumption against fraud was held to be proper.

In an article in 5 North Carolina Law Review (1927), Charles T. McCormick, professor of law of North Carolina University, treats of "Charges on presumptions and burden of proof." He asks the question whether an instruction on presumptions should always or never be given. He takes a middle course; that ordinarily the matter should be left to the discretion of the trial judge, but that in some cases, in order that a presumption be effectuated, an instruction thereon should be given. Edmund M. Morgan, Professor of Law of Harvard University, in 47 Harvard Law Review 59, treats of "Instructing the jury upon presumptions and burden of proof," and states in part as follows:

"A presumption, then, will utterly fail of its purpose as to any issue to be decided by the jury if it vanishes upon the mere introduction of evidence which makes

the issue one for the jury; it will best justify its existence if it persists until the evidence persuades the jury that the presumed fact does not exist, or at least, that its non-existence is equally as probable as its existence. There is no difficulty in framing or applying an instruction which will enable it to perform this more desirable office. Consequently, one of the two views should be adopted. * * * The conclusion then is that most presumptions should, where applicable at all, continue to operate unless and until the evidence persuades the trier (of fact) at least that the non-existence of the presumed fact is as probable as its existence."

In view of the confusing state of the law on the subject before us, we have thought it advisable not to draw any unnecessary conclusions and to limit ourselves as much as possible to the exact presumption here involved. In the case at bar, not only was substantially all of the testimony of the plaintiff that of interested witnesses, but none of it, as already indicated, necessarily required the inference of malice, notwithstanding the vigorous claim of counsel for the plaintiff to the contrary. Two incidents are claimed to be of importance. We cannot go into details. One, involving Mr. Worth—the so-called swimming episode—would warrant the conclusion that if the statements made by him in that connection are true, they were but the outburst of temporary anger, caused to a large extent by the fact that plaintiff told Mr. Worth that her going swimming without her husband was none of his business, and that she called him a liar and refused to apologize for it. The other incident, involving Mrs. Worth, could be construed as one of those unfortunate incidents which, proverbially, take place between mother-in-law and daughter-in-law.

The presumption of good faith in this case, operating as it did in favor of the defendant, could not subserve the purpose of shifting the burden of going

forward with the evidence, since the burden to show the contrary of good faith was on plaintiff in any event, so that, if that is the only function of a presumption in all cases, defendants could derive no possible benefit from it here. A similar situation was considered in the case of Lisbon v. Lyman, 49 N. H. 553, 563. It was there held that an instruction, that the presumption should be taken into account as one of the elements of evidence, was erroneous. We have no occasion here to question that holding. But the court apparently further held that a presumption in such situation is of no value whatever. In Water Commissioners v. Robbins, 82 Conn. 623, 640, 74 A. 938, the court considered two presumptions operating in favor of the defendants, one against fraud and one regarding the performance of governmental duties. The court in discussing presumptions stated: "When such a presumption is advanced in favor of one upon whom the burden of proof does not rest, it really adds nothing to the duty or burden of the other party, since the latter is already under the obligation to present proof in support of the contention, and the presumption only reiterates that obligation." However, the court had instructed that "fraud and bad faith was not to be presumed," so that we are not certain just what the court had in mind.

It is not, we think, quite correct to say that the "presumption only reiterates" the obligation of the burden of proof. An instruction that the burden to prove malice is on the plaintiff states the duty resting on the latter. An instruction that the jury must start out with the assumption that the defendants were in good faith states a benefit or privilege conferred upon the defendants by the law. It at least makes that benefit clear and brings it home to the jury—which, after all, is the one important point in a jury trial. It is, in fact, a distinct thought which, particularly if pressed

home to the jury by counsel, may often be of value. And that it should be of value is unquestionably the intent of the law. If what is said in the Connecticut case is correct, it is apparent that the presumption, created by law specially in favor of parties situated as the defendants herein, would, so far as the jury is concerned, be but a phantom. It is hardly possible that a presumption such as we are dealing with here can be of that nature. It is not a procedural rule; it is based upon reason; upon the strong love usual in parents for their children. By giving merely the ordinary instruction, and refusing that on presumption, would not even call attention to the inference, which, as a matter of reason (Wigmore, supra, Sec. 2491) remains to be considered in any event no matter how we view a presumption. If our reasoning herein is faulty, and logic requires that the presumption herein be considered as a phantom, then we should feel warranted in appealing herein to the statement made by us in First Nat. Bank v. Ford, 30 Wyo. 110, 216 Pac. 691, 31 A. L. R. 1441, that "logic in law must to some extent be tempered by considerations of public policy and justice." We find it stated that, in order that parents may be held liable for alienation of affection, their interference must be aggravated; Miller v. Levine, (Me.) 154 Atl. 174; that the evidence of malice must be clear; Cramer v. Cramer, supra; Spiry v. Spiry, 47 S. D. 500, 199 N. W. 778; that the presumption which arises in favor of parents in such case is strong; Spiry v. Spiry, supra; Miller v. Levine, supra; that the measure of proof must be extremely high; Hall v. Hall, 174 Cal. 718, 164 Pac. 390; that it must be stronger than in other cases; Russell v. Page, 241 App. Div. 833, 271 N. Y. S. 251; 13 R. C. L. 1474. Mr. Thayer (Ev., 336 and Appx. B, p. 576) would say when such expressions occur, that the presumption is accompanied by a rule relating to the weight of the

evidence. Perhaps so. Nevertheless, reason dictates that an important presumption, intended to benefit parents in a material way, should not be kept hidden from the jury. The instruction on the burden of proof given herein was the ordinary instruction on that subject. It put the case upon the exact level of any other case. But the law puts it on a different level. In fact Indiana, New York and Illinois, in the present year, outlawed actions of this nature entirely as against public policy. Michigan Law Review, Vol. 33, p. 997. We think, therefore, that the requested instruction, or the fundamental ideas contained therein, should have been given to the jury. It is not necessary, however, to decide, and we do not decide, that the failure to do so, standing by itself, would be sufficient to reverse the case.

2. During the summer of 1930, while plaintiff and her husband were living at the Salliday place, some thirteen miles away from the home of the parents, the plaintiff became pregnant, and she and her husband apparently agreed that she should go to Nebraska and stay there until after her confinement, which was not expected until March, 1931. She went some time in November. Late in December she received a letter from a Mrs. Rich, a friend, advising her to return if she expected to keep her husband. She met Mrs. Rich in Cheyenne and drove with her to Wheatland where she arrived on December 30, 1930. The next day she went to the post office and was handed a bunch of letters addressed to her husband by another woman, with whom, apparently, Harold had illicit relations. Plaintiff tried to find Harold, but did not succeed for a day or so. The testimony is not clear at this point. Harold was or had been in Denver with this other woman. The day following the finding of the letters, plaintiff consulted an attorney, and on January 2, 1931, filed a complaint for separate maintenance. On Jan-

uary 13, she filed a criminal complaint against Harold. What became of that does not appear. In March of that year Harold took his wife to Cheyenne to be confined there, and went to see her again on the following Sunday, and during these trips the couple were apparently friendly and planned for the future. Plaintiff seemingly left Cheyenne and went to Wheatland a few days thereafter without any knowledge of Harold, who, again on a visit to Cheyenne, found her gone. The parties apparently have been separated ever since. These facts have been stated as preliminary to what follows.

Oscar O. Natwick was prosecuting attorney at Wheatland during December, 1930, and January, 1931. In the early part of the latter month, and apparently before a criminal complaint against Harold was filed, the defendant Mr. Worth had a conversation with Natwick as to the relations of Harold and his wife. Asked to state it, the court sustained an objection on the grounds that it was hearsay and self-serving. The defendant then offered to prove by the witness that Mr. Worth came to him and stated that he, Worth, desired his help and co-operation in getting his son Harold and the plaintiff in this case together, and that his only interest in the case was that the trouble between them be adjusted, and that they would be reunited and continue to live as husband and wife and properly raise the expected child, and that if they could be reunited all preceding trouble and disagreements could be adjusted. This was objected to as hearsay and self-serving. The court sustained the objection on that ground and also because the statement was made after the separation of Harold and his wife. Error is assigned on that account. The point at law involved is important, and has given us no little trouble. In 13 R. C. L. 1475, it is said:

"In actions for alienating a spouse's affection, the motives actuating the different parties become a material subject of proof, and a wide latitude is exercised by the courts in admitting evidence for such purpose, which ordinarily might be subject to the objection against hearsay evidence and self-serving declarations."

In 30 C. J. 1142, the broad rule is laid down, that "except where otherwise inadmissible as immaterial and irrelevant, evidence of defendant's act or conduct, both before and after the alienation or separation, or even after suit brought, is admissible to prove or disprove his or her responsibility therefor."

The offered testimony, in the main, tended to show an effort on the part of the defendant Mr. Worth to effect a reconciliation between the young married people. Such efforts, made by statements and declarations to the alleged alienated spouse, which naturally would be the ordinary method adopted, have been considered by the courts a number of times. We take it, however, that the particular method adopted is not important. In Eagon v. Eagon, 60 Kans. 697, 57 Pac. 942, followed in Nevins v. Nevins, 68 Kans. 410, 75 Pac. 492 without discussion, and in Murphy v. Willumsen, 224 Ill. App. 425, it was held that such evidence is not admissible because violative of the self-serving evidence rule. The Illinois case has been repudiated by subsequent cases in that state, and courts which have mentioned the Kansas cases have refused to follow them. The great weight of authority is to the contrary. Bailey v. Bailey, 94 Iowa 598, 63 N. W. 341; Noll v. Carlin, 101 Or. 203, 199 Pac. 596; Caplan v. Caplan, 83 N. H. 318, 142 Atl. 121; McGowan v. Armour, 248 Fed. 676; Daywitt v. Daywitt, 63 Ind. App. 444; Rudd v. Rounds, 64 Vt. 432; Scott v. O'Brien, 129 Ky. 1, 110 S. W. 260; Dunn v. Dunn, 241 Ill. App. 11; Fox v. Fuchs, 241 Ill. App. 242; Lindenberger v.

Klapp, 254 Ill. App. 192. The case of Heisler v. Heisler, (Ia.) 127 N. W. 823, is too brief and indefinite on the point to be of assistance herein. It in no way refers to the earlier Iowa case. An excellent review of most of the authorities may be found in the opinion of the majority in Fox v. Fuchs, supra, and in the concurring opinion of Mr. Justice Thompson.

The question in such cases is: Did the defendant separate the young people? Whatever conduct or declarations tend to show the affirmative, and whatever conduct and declarations negative that fact, are admissible. They are part and parcel of the case. In Bailey v. Bailey, supra, the court said in part:

"Such testimony (statements to induce the young people to stay together) would have a tendency to negative the idea that defendant was trying to induce his son to abandon the plaintiff. It was substantive testimony of verbal acts tending to show that he was trying to induce his son to live with plaintiff, and that the son's refusal was not brought about by his conduct * * * The court permitted defendant to show what he did to induce his son to live with plaintiff. What he said to accomplish the same purpose was a part of the *res gestae*, and was, it seems to us, equally admissible."

In Caplan v. Caplan, supra, the court said in part:

"In defense, the defendants were entitled, not only to deny conduct inducing alienation, but to show conduct avoiding it. Neither the hearsay rule nor argument that the conduct 'self-served' the defendants may be invoked to exclude such evidence. If the defendants advised and counselled David (the son) not to separate from his wife, evidence of the fact is as material to the issue as evidence of conduct inducing separation. And not only may the fact of such advice and counsel be shown, but its details and character are pertinent and of value on the issue as showing its force and sincerity or otherwise * * * As verbal acts the statements were more than a part of the *res gestae*. They were the *res gestae*."

The argument that such evidence was properly excluded because made after separation of the young people is not sound. The gist of the action herein is the loss of consortium, which includes the right to the society of the spouse. Riggs v. Smith, 52 Idaho 43, 11 P. (2d) 358. The final separation did not take place till March, 1931. At the time of the interview there was ample opportunity for reconciliation. The exact point was involved in Lindenberger v. Klapp, supra. We shall let the court speak for itself:

"An offer was made to prove by the defendant that he had had conversations with the wife of the plaintiff on several occasions, shortly after the plaintiff left his wife and the home of the defendant, in which he, the defendant, had tried to secure a reconciliation between the plaintiff and his wife. An objection was sustained to the offer and this evidence was not admitted. * * * We think this evidence should have been admitted under the authorities as laid down in Fox v. Fuchs, supra; Dunn v. Dunn, 241 Ill. App. 11; and Bailey v. Bailey, 94 Iowa 598, 63 N. W. 341."

In Hoxie v. Walker, 75 N. H. 308, 74 Atl. 183, it was held that proof of the fact that defendant, who was sued for alienation of affection, had ejected plaintiff's husband from her house, was admissible in evidence, even though that took place after the action for alienation of affection had been commenced. In Noll v. Carlin, supra, the defendant was permitted to introduce evidence tending to show her efforts to prevent a separation between the plaintiff and his wife, by introducing in evidence a letter written before final separation but while the young people had trouble.

In the case at bar the method adopted in the effort to prevent separation of the young people was not by statements made to the son. It was more indirect. But Natwick was prosecuting attorney, and as such occupied a peculiar position. It enabled him to assist materially, so that the alienation of Harold should stop

short of being complete and to effect a reconciliation. In fact at that particular time, and under the circumstances, it is not unlikely that efforts through him would be as effectual as direct efforts by the defendant, if not more so. Evidence of conduct causing the separation would have been admissible against him, whether the methods adopted were direct or indirect. The same rule should prevail in connection with efforts to keep the young people together.

We should, however, note a difference here. If the efforts of Mr. Worth had been followed up by efforts of reconciliation by Natwick, the situation would have been parallel to direct efforts of defendant by means of statements to the son. But the record does not show whether the request made by defendant G. M. Worth of Natwick was followed up. Should that make a difference? Suppose that defendant could not have reached his son, he being at a distance where his mother, brothers and sisters could reach him, and defendant had made frantic appeals to such mother and other relatives to see the son and induce him not to separate from his wife, but that the appeals were not answered. Should the efforts thus made count for naught? We think not. The logical basis, or what is said to be the logical basis, for the holding of the cases heretofore cited, centers on the point that direct efforts against alienation may be shown. That exact situation does not exist here. Still it would seem that the testimony offered in this case would have a tendency to negative the idea that defendant Worth was trying to induce his son to abandon the plaintiff, since he was attempting to have something done wholly inconsistent therewith and contrary thereto, and that the difference in this and other cases cited should not, therefore, if for no other than a practical reason, require a different holding. If this is not true, however, and if we must find a more logical basis for the admission

of the offered testimony in question, we have no difficulty in finding it, and need merely turn to the second element which is of the gist of this action, namely, the question of malice, for it is clear that the offered testimony would have rebutted that. It would have shown the state of mind of the defendant, and that was important. Daywitt v. Daywitt, supra; Caplan v. Caplan, supra. In the latter case the court, speaking of such statements, said:

"The evidence was also admissible as showing the state of mind and feeling of the defendants towards the plaintiff. Their attitude towards her might be shown by their declarations in the same way as hers towards them and David might be shown by her declarations."

And we take it as self-evident that such state of mind can be shown by statements to a third party as well as by statements to a son. When a mental state or condition is in issue, such as motive, malice or intent, an exception is made to the hearsay rule. Jones, on Ev. (2nd Ed.) Sec. 1088; Wigmore, Evidence, (2nd Ed.) Sec. 1714. Moreover, cases of alienation of affection are *sui generis*. Noll v. Carlin, supra. Thus letters between husband and wife have been held admissible to show their state of mind. 30 C. J. 1143. Without passing on the correctness of the holding, statements by plaintiff or spouse, if they show their state of mind, have been held admissible, though not made in the presence of defendants, and though to some extent relating to them. 30 C. J. 1140; Bourne v. Bourne, 43 Cal. 516, 185 Pac. 489; Welty v. Sparks, 179 Iowa 1390, 162 N. W. 614; Caplan v. Caplan, supra. See 82 Pa. Law R. 403 *et seq.* Furthermore, while it has often been said that the declarations of a party in his own favor cannot be received in evidence (Jones, supra, p. 1636), it expresses but a partial truth. In many cases that is not true. In fact, there is no prin-

ciple of evidence especially excluding self-serving statements by an accused or anyone else. If they are inadmissible, it is because they are hearsay, or because of some other reason. Wigmore, supra, Sec. 1765. In Caplan v. Caplan, supra, the court, speaking of declarations in such case, said in part:

"Nor is the argument that the evidence was of a 'self-serving' character available. In all trials, evidence of conduct of a party which is in his favor on the issues is admitted without question, and the fact that it 'self-serves' him is no reason for its exclusion. Otherwise trials would obviously be greatly limited, and evidence of rightful conduct to meet the charge of conduct that was wrongful would be excluded. While evidence of one's conduct and statements is to be excluded in many situations, it is by reason of some other rule than one which bars evidence, because it is of a self-serving character. That it is of such character may be an argument in support of the validity and soundness of the rule, but it is not the rule itself. While in many cases it is pronounced that there is a general rule 'which precludes a party from supporting his cause by giving evidence of his own sayings' (Barker v. Barker, 16 N. H. 333, 339), as a rule it is merely a part of, and embraced within, the hearsay rule."

It may not be without interest to note the opinion of Professor Wigmore, in his great work on Evidence (2nd Ed.), Sec. 1732, in connection with his treatment of self-serving declarations under a similar situation. He says:

"It has been argued that the party (an accused) must not be allowed to 'make evidence for himself.' But this objection applies equally to many classes of statements * * * and is yet not thought of as fatal. Moreover, the motion of 'making,' that is 'manufacturing' evidence, assumes that the statements are false, which is to beg the whole question. Then it is further suggested that at any rate the accused, if guilty, *may* have falsely uttered these sentiments in order to furnish in advance evidence to exonerate him from a

contemplated crime. But here the singular fallacy is committed of taking the possible trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proved guilty; in other words, the fundamental idea of the presumption of innocence is repudiated. * * * Because (we say) this accused person *might* be guilty and therefore *might* have contrived these false utterances, therefore we shall exclude them, although without this assumption they indicate feelings wholly inconsistent with guilt, and although, if he is innocent, their exclusion is a cruel deprivation of a most natural and effective sort of evidence. To hold that every expression of hatred, malice and bravado is to be received, while no expression of fear, good will, friendship, or the like, can be considered, is to exhibit ourselves the victims of a narrow whimsicality, which might be expected in the tribunal of Jeffreys, going down from London to Taunton with his list of intended victims already in his pocket. * * * But it was not to have been anticipated in a legal system which makes so showy a parade of the presumption of innocence and the rights of the accused. This question-begging fallacy about 'making evidence for himself' runs through much of the judicial treatment. There is no reason why a declaration of an existing state of mind, if it would be admissible against the accused, should not also be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive."

Perhaps courts have sometimes gone too far in their horror of self-serving statements. In the case at bar the record fails to show that the Natwick interview was made under suspicious circumstances or that at that time there was any cause for manufacturing evidence. Plaintiff and her husband had not lived with the defendants for nearly a year. The immediate cause, even though not the sole controlling cause, for the separation of the young people at that time was Harold's relation with another woman. That was the critical time, when, if ever, the natural impulse of a father would cause Mr. Worth to interfere, if he did

not wish his son to separate from plaintiff. The suit herein was not commenced until six months thereafter. The state of mind of the defendant was, as heretofore stated, of importance. In fact statements of his, made just a few days previous to the Natwick interview, had been introduced by the plaintiff herself, for the purpose, presumably, of showing that state of mind. It was thought important by plaintiff to show it as it was at that time. If nothing else, fairness to him would seem to suggest, that plaintiff should not alone be permitted to show what the state of mind actually was. That is true, even though it could be said that the alienation of affection was complete at that time. Evidence showing defendant's state of mind thereafter, but antagonistic to plaintiff, has been held admissible. Vallone v. Vallone, 228 Ill. App. 543; Woodhouse v. Woodhouse, 90 Vt. 91, 130 Atl. 758; Tucker v. Tucker, 74 Miss. 93, 19 So. 955, 32 L. R. A. 623. It was so held probably on the theory of the presumption of continuance of a state of mind once shown. We see no reason why the same principle should not be applied here. And after a most careful consideration of the point under discussion, we have concluded that, particularly in view of the fact that cases of this character are *sui generis*, the proffered testimony should have been admitted in evidence.

3. The defendants requested the court to instruct the jury as follows:

"You are instructed that the law does not require anything whatever from the hands of parents-in-law except that they do not meddle maliciously with the domestic felicity and affections of their son and wife. The parents may hold aloof, decline to recognize the wife, and show no interest in her or her children; and the law imposes no duty upon a parent to support or contribute to the support of a married son and his wife and their children."

The court refused to give this instruction, and error is predicated thereon. Counsel for plaintiff call attention to the fact that Mr. Worth and his son had an arrangement that the latter should receive a certain share of the profits, but it is not shown that these profits were not paid him. Much of the testimony introduced was either intended to show, or at least had the tendency to show, that defendants were niggardly and stingy. From the fact that all such testimony was admitted the jury probably concluded that the plaintiff was proceeding upon the theory, and that rightly, that the defendants owed her a living and should have taken better care of her. Some of the testimony, for instance, related to the defendant's stingy conduct in connection with the baby's layette; that plaintiff used too much cream; that Mrs. Worth stated that plaintiff was wasting money by remaining too long in the hospital. Plaintiff testified that when her first baby was born, she had no money; that she needed clothes, especially shoes; that her shoes were practically soleless; that Harold had been receiving spending money from his father all the time and that one day she spoke to his father about it; that she showed him her shoes and asked him if he would not tell Harold to buy her shoes; that he told her that Harold was his son, and he could give him spending money if he wanted to, but that he was under no obligation to take care of his wife; that during all the time she was married, Harold bought her but one dress; that Mrs. Worth bought her but one dress, and that neither defendant gave her any money. We are unable to see how this testimony had any bearing on the issues of this case, unless it be to show the state of mind of defendants towards the plaintiff, and if admissible for that purpose, which we need not decide, the defendants were at least entitled to the instruction requested, so as to offset in some degree the natural prejudice engendered by that char-

acter of testimony. That the requested instruction states the correct principle of law seems to be clear, from the authorities cited by defendants. Cooper v. Cooper, 102 Kans. 378, 171 Pac. 5 (from which the instruction requested was taken); Ogg v. Ogg, 124 Kans. 443, 260 Pac. 647; Caplan v. Caplan, supra; Kadow v. Kadow, 195 Wis. 650, 219 N. W. 275. And the instruction fitted into the facts presented by plaintiff.

4. The plaintiff was interrogated with reference to conversations about having friends, and testified at length as to statements showing the unsociable character of defendants; that they stated that they did not want friends; "that friends don't make you a dime"; "we don't want anybody to eat with us." "If you begin inviting people in you would have people on your hands all the time," etc., and that Harold afterwards repeated some of the same expressions. Error is assigned on account of this testimony. It may be that the objections were not quite what they should have been. In view of another trial, however, we think we should say that while courts appear to have been liberal in admitting testimony in cases of this character to show the relations of the parties and the motives of the defendants (Noll v. Carlin, 101 Or. 203, 199 Pac. 596), at the same time "the courts invariably sound a warning that such evidence may easily wander too far afield." (Hankins v. Hankins, 202 N. C. 358, 162 S. E. 766), and we think that the foregoing testimony went too far afield. It is most difficult to see how it could reasonably be said to have a tendency to prove the issues herein, namely, the fact of alienation and that the parents maliciously caused it. On the other hand, while counsel for plaintiff thinks that the testimony was unimportant and not prejudicial, we think that it could not but have the effect of deeply prejudicing the jury and in fact causing them to believe that the defendants belonged to the dregs of

humanity. The statements were denied, but if true they showed that the defendants were niggardly and unsociable. They showed an outlook on life which is ordinarily condemned, and that severely. Still, defendants had a right to their own opinions on such questions, and the right to express them. We cannot hold that plaintiff has a monopoly on the adoption of her outlook on life, with a right to penalize those who disagree with her. It would hardly seem consonant with public policy to make it *per se* dangerous for parents to give an abode to their child and his or her spouse, and yet that would clearly result if we should countenance a theory that parents dare express their own opinion on questions not criminal in character, but representing merely an outlook on life relating to economic or social questions, only at the peril of perhaps having to respond in damages therefor in an action such as we have here. It was well said in Caplan v. Caplan, 83 N. H. 318, 142 Atl. 121, that "action, on the face of it rightful, cannot be found wrongful by conjectural assumption that it was inspired by malice and bad faith." Sight must not be lost of the fact— though seemingly it has been to a considerable extent —that this is not an action to punish the defendants for not creating for plaintiff more sociable and pleasant surroundings. See Hankins v. Hankins, supra. Much of what we have said applies to the testimony that the opinion of the parents was that pregnant women ought not to appear in public. That was the general view of the past generation. The defendants should not be penalized for opinions which were probably transmitted to them by their forebears. They had a right to that opinion. Apparently plaintiff conformed to it, except when Mr. Worth took her out to a public meeting. We are at a loss to know what possible bearing the testimony could have on the issues of the case. It probably was not, however, prejudicial.

5. There was testimony that, during the time that plaintiff was confined in the hospital at Wheatland, a statement was made by Mrs. Worth to her son to the general effect that plaintiff was pretending to be sicker than she was and that she was simply running up expenses. An objection that it was irrelevant and immaterial as to Mr. Worth was overruled. Counsel for plaintiff contends that the testimony was admissible as to Mr. Worth because there was sufficient testimony of a conspiracy between the defendants. We think that counsel is in error, unless the mere fact of marriage and similar thought and expression on similar subjects be so considered. In that event it would be seldom if ever that husband and wife could escape the charge of conspiracy. We think the true rule was expressed in the case of Caplan v. Caplan, 83 N. H. 318, 142 Atl. 123. In that case, as in this, plaintiff charged that to some extent and in certain respects the husband of one of the defendants participated in the tort of alienation of affection of the son. The court sustained the judgment against the defendant wife, the correctness of which was conceded, but directed judgment in favor of her husband. The court said among other things:

"It is also argued that a husband is liable for his wife's torts, at least when they are committed in his presence, and not objected to by him. This contention is unavailing. 'Every married woman * * * may * * * sue and be sued, * * * for any wrong by her done, as if she were unmarried,' P. L. c. 288, § 2, '* * * since he (the husband) has no more legal power of physical control over her than she has over him, no more reason seems to remain for holding him liable for her torts than for holding her liable for his.' Harris v. Webster, 58 N. H. 481, 484. 'Husband and wife now stand upon an equality of right in respect to property, torts, and contracts,' subject only to express statutory exceptions. Seaver v. Adams, 66 N. H. 142, 143, 19 A. 776, 49 Am. St. Rep. 597. The husband's lack of right to exercise physical control over his wife does away

with any presumption of coercion by reason of the marital relationship, and the fact of marriage is not enough to justify an inference of participation or furtherance from acquiescence or approval. 'It is not enough that he should know of and acquiesce in the tort, or even approve of it; but he must have had some active participation in bringing it about, either by some act which he did himself, or something which his wife did under his direction.' Claxton v. Pool, (Mo. Supp.) 197 S. W. 349, L. R. A. 1918A, 512. See, also, Multer v. Knibbs, 193 Mass. 556, 79 N. E. 762, 9 L. R. A. (N. S.) 322, 9 Ann. Cas. 958."

In the case of Miller v. Miller, 165 Md. 425, 169 Atl. 426, some of the conversations were, according to the testimony, engaged in by both parents, just as in the case at bar. The court, however, in exonerating the father, said:

"The plaintiff contends that because at common law the husband was liable during coverture for all the torts of his wife, whether committed by her within or without his presence and with or without his participation or sanction, the husband in the present case is equally responsible for all of the acts and words of his wife done or uttered in his presence; and as authority for this contention it is pointed out that the Code, art. 45, § 5, provides that the husband should be relieved of responsibility for the torts of his wife when 'committed separately by her out of his presence, without his participation or sanction.' If it be true that under the present state of the law, which we do not here decide, a husband is responsible for all torts committed by his wife in his presence, we do not think that in a case for alienation of affections every word and act of the wife, constituting a chain of words and acts which may result in a verdict against her, can be chargeable to the husband where it is shown that he may have been present at the doing of some of the acts, or within hearing of some of the words spoken. We have been referred to no case at common law or since the passage of the statute wherein the husband has been held responsible in cases of alienation of affection for the acts and words of the wife, solely because of his presence; but, on the contrary, there are

numerous cases where the suit has been against both parents and a verdict has been rendered against one and not the other."

6. Error is assigned because of misconduct of counsel for plaintiff. The error, if error it is, probably will not be repeated on another trial, and we need not give the point further consideration. Counsel for appellants also argue at length that the evidence is insufficient to sustain the verdict. It has not been easy to decide as to whether it is our duty to pass on that point. Perhaps we should say something on it. Counsel for the plaintiff states that "in only one case, among the many that we have examined, is there to be found such a course of malicious and inhuman treatment as that administered by the defendants to the plaintiff in the case at bar. That is the case of Stocker v. Stocker, 36 A. L. R. 1063 (Neb.) 1924." There is, however, at least one vital and important difference. The Nebraska court could find nothing in the record to which the separation of the parties could be attributed except the conduct of the parents. In the case at bar, the separation can very well be, if it must not be, attributed to facts which had nothing to do with the parents. To hold them liable, their conduct must have been the controlling cause that destroyed the affections. 30 C. J. 1125. The separation did not take place till nearly a year after any serious difficulty with defendants. Much of the evidence has little, if any, tendency to prove any of the issues. The case heretofore made is not a strong one, particularly as to G. M. Worth. We shall not point out further reasons. But we think that in any event we should not render final judgment herein, but should send the case back for a new trial, and hence we shall not pass upon the sufficiency of the evidence. Similar reasons govern us in not passing on the point argued that the amount of the judgment is excessive.

The judgment herein is accordingly reversed, and the cause remanded for a new trial.

*Reversed and Remanded.*

KIMBALL, Ch. J., and RINER, J., concur.